## MARTIN *v.* NATIONAL SURETY CO. ET AL.

No. 500. Argued March 2, 3, 1937.—Decided March 29, 1937.

*Mr. Richard S. Bull,* with whom *Mr. Harold R. Small* was on the brief, for petitioner.

*Mr. J. H. Cunningham, Jr.,* with whom *Mr. William L. Igoe* was on the brief, for respondents.

Mr. Justice Cardozo delivered the opinion of the Court.

A controversy is here as to the interests of rival claimants in moneys paid by the Government pursuant to a building contract, the one claim being founded on an assignment to a surety, which is held for the benefit of materialmen and laborers, the other on a power of attorney, later than the assignment, which was given to a creditor as security for a loan.

On February 12, 1932, a contract was made between the Government of the United States and Tobin, a builder, for the construction of a Post Office at Carlinville, Illinois. The statute called for a bond with a good and sufficient surety conditioned to the effect that the contractor would promptly make payment to all persons supplying the principal with labor and materials in the prosecution of the work. 40 U. S. C. § 270; *American Surety Co.* v. *Westinghouse Electric Co.*, 296 U. S. 133, 135. Such a bond was given in the sum of $25,000 by the National Surety Company, acting through Guy S. Martin, its agent. Martin, who is the petitioner in this court, had been ordered by one of the officers of the company not to execute the bond, and in signing it disobeyed the order. The fact of disobedience was unknown to the obligee, and by concession the bond is binding according to its terms. In a written application the contractor stated to the surety that he had not assigned and would not assign to third persons his payments on the contract or any part thereof. In further consideration of the execution of the bond he did by the same instrument assign the payments to the surety in the event of any breach or default in the contract, the proceeds to be credited upon any loss or damage.* There

---

* The assignment reads as follows: "That in further consideration of the execution of said bond, the undersigned hereby assigns, transfers and conveys to the Company all the deferred payments and re-

was also a covenant of indemnity, and a covenant that in the event of the filing of any liens there would be a deposit with the surety sufficient to secure them.

Martin's agency was canceled after the writing of the bond in breach of his instructions. With full knowledge of the application and of the duties there assumed, he loaned moneys to the contractor from time to time under an agreement for the division of the profits of the enterprise. By December, 1932, when the building was near completion, the total of these loans was in excess of $10,000, exclusive of any interest. The work had been done to the satisfaction of the Government, but bills for labor and materials were largely in default. The surety became alarmed. In the latter part of December an officer of the company gave notice to the contractor that the company would insist upon the execution of a power of attorney for the collection of any payments then owing from the Government or falling due thereafter. Tobin took the document away with him, promising to show it to his lawyer. Instead he showed it to Martin, for whose benefit he signed another power of attorney as well as a letter, addressed to the Treasury Department, directing that all checks for Tobin should thereafter go to Martin. These documents were intended to have the effect of an assignment which would be security to Martin for the amount of his advances. Both documents were forwarded to the Treasury as soon as they were signed. The surety did not know of them till five or six weeks later. At last, on Feb-

tained percentages, and any and all moneys and properties that may be due and payable to the undersigned at the time of any breach or default in said contract, or that thereafter may become due and payable to the undersigned on account of said contract, or on account of extra work or materials supplied in connection therewith, hereby agreeing that such money, and the proceeds of such payments and properties shall be the sole property of the Company and to be by it credited upon any loss, cost, damage, charge and expense sustained or incurred by it under said bond."

ruary 4, 1933, Tobin, pressed again to carry out his agreement, admitted that the power of attorney had been turned over to Martin, but promised to try to get it back. Even then there was denial that it was on file in the Treasury. But the promise, even if sincere, was no longer susceptible of fulfilment. On the very day it was made, Martin had gone to Washington, had visited the Treasury, and had received from the Government a warrant for $10,-448.10, the progress or deferred payments then due upon the contract. This sum he collected on February 6, and applied upon his loans. At that time the building was substantially completed, though there was still owing from the Government $5,700, made up of a retained percentage plus a small additional amount to cover unfinished work.

The surety ascertained the truth a day or two thereafter. On February 9, 1933, it brought suit in a District Court in Missouri to protect the interests of the materialmen and laborers, joining Tobin and Martin as defendants as well as certain officers of the Government. It prayed *inter alia* that the moneys received by Martin be impounded, and that the fund, when deposited in court, be disbursed in payment of the bills for material and labor, and in exoneration of the bond. At the beginning of the suit, Tobin was already insolvent. The surety became insolvent later, and renounced in favor of the materialmen and laborers all its rights and interests in the fund in litigation. Martin, yielding to the compulsion of interlocutory decrees, paid into the registry of the court what he had collected from the Government. After notice to materialmen and laborers to file their claims against the fund, the court made a final decree disposing of the controversy. Martin's claim was dismissed on the ground that he was a partner with the contractor, and could gain nothing by his assignment except in subordination to the creditors. The claims of materialmen and laborers (here-

inafter, for convenience, referred to as materialmen) were considered and adjudicated, and distribution was decreed.

The case went to the Court of Appeals for the Eighth Circuit upon an appeal by Martin. The decree was there affirmed. 85 F. (2d) 135. Without disputing the finding that Martin was to share with Tobin in the profits of the enterprise, the Court of Appeals did not pass upon the question whether the relation was one of partnership. It placed its ruling upon the broad ground that, apart from any assignment or any statute, the proceeds of a building contract are chargeable in favor of materialmen with an equitable lien, which attaches upon collection, even if not before, and which cannot be overridden at the will of the contractor by payment to his other creditors, though the payment be made in fulfilment of a promise. For this it cited *Belknap Hardware & Mfg. Co. v. Ohio River Contract Co.*, 271 Fed. 144, and *United States Fidelity & Guaranty Co. v. Sweeney*, 80 F. (2d) 235, 238, conceding the existence of other cases contra. *Third National Bank v. Detroit Fidelity & Surety Co.*, 65 F. (2d) 548; *Kane v. First National Bank of El Paso*, 56 F. (2d) 534; *Fidelity & Deposit Co. v. Union State Bank*, 21 F. (2d) 102. The opinion dwells upon the confusion in which the subject is enveloped. We granted certiorari.

Our decision will be kept within the necessities of the specific controversy here. Even so, the grounds chosen, though narrower than those assigned below, may be expected to be helpful as a guide in other cases. The proceeds of the contract, when collected by Martin under his power of attorney, were received by him with knowledge of the agreement between the contractor and the surety whereby such proceeds became a fund to be devoted in the first instance to the payment of materialmen and others similarly situated. In our view of the law,

the equities in favor of materialmen growing out of that agreement were impressed upon the fund in the possession of the court.

An Act of Congress tells us that all transfers and assignments "of any claim upon the United States . . . and all powers of attorney, orders, or other authorities for receiving payment of any such claim . . . shall be absolutely null and void, unless they are freely made and executed in the presence of at least two attesting witnesses, after the allowance of such a claim, the ascertainment of the amount due, and the issuing of a warrant for the payment thereof." R. S. § 3477; 31 U. S. C. § 203. By force of that pronouncement the Government was at liberty to hold the money back till demanded by the contractor personally, disregarding any assignment or power of attorney for its payment to another. But the Government did not choose to shape its course accordingly. It turned over the money to Martin as Tobin's representative, thus discharging its indebtedness as effectively as if payment had been made directly to the principal. *McKnight* v. *United States,* 98 U. S. 179. The case is to be viewed as if Tobin had received the warrant, had put the proceeds in his bank, and had paid them afterwards to Martin. Will Martin be allowed to keep them in the face of his knowledge of the earlier assignment to the surety and of the promise that no assignment would be made to anyone else?

The provisions of the statute making void an assignment or power of attorney by a Government contractor are for the protection of the Government. *Hobbs* v. *McLean,* 117 U. S. 567, 576; *McGowan* v. *Parish,* 237 U. S. 285, 294, 295. In the absence of such a rule, the Government would be in danger of becoming embroiled in conflicting claims, with delay and embarrassment and the chance of multiple liability. *Hobbs* v. *McLean,*

*supra.* But as applied to the fund in controversy, that peril is now past. The fund is in court to be distributed to rival claimants, with the Government discharged irrespective of the outcome. The very fact that an assignment is permitted even as between the contractor and the Government itself when the warrant is outstanding, if the transfer be executed with prescribed formalities, is significant that the Government is not concerned to regulate the equities of claimants growing out of irregular assignments when collection is complete and liability is ended. The purpose of the statute "was not to dictate to the contractor what he should do with the money received on his contract after the contract had been performed." *Hobbs* v. *McLean, supra.* A transfer of a warrant has need to be accompanied by safeguards lest the assignor may avoid it afterwards for forgery or fraud. A transfer of the fund after payment is perfected is of no concern to any one except the parties to the transaction, and this quite irrespective of the time of the assignment or the manner of its making.

If the Government has any interest in the outcome of this controversy it is in sustaining the assignment to the surety rather than destroying it. The contractor undertook that materialmen would receive their money promptly while the work was going on. In failing to pay them, he violated a duty to them, but a duty also to the Government, for the default was a breach of the condition of the bond. If the assignment to the surety creates a lien upon the fund, the contractor will be compelled to fulfill the duty thus assumed. A different question would be present if the surety were seeking to keep the money for itself. Cf. *American Surety Co.* v. *Westinghouse Electric Co., supra; Jenkins* v. *National Surety Co.,* 277 U. S. 258, 266. There is no such effort here. On the contrary, the surety, claiming nothing for

itself, is devoting the full proceeds of the assignment to the satisfaction of the liabilities covered by the bond. Has the assignment been so obliterated through the condemnation of the statute that when used by the surety in aid of such a purpose it does not generate an equity worthy of recognition?

The advocates of literalism find color of support in a line of decisions made in very different circumstances from these, but tending none the less to a strict construction of the statute. *National Bank of Commerce* v. *Downie,* 218 U. S. 345; *Nutt* v. *Knut,* 200 U. S. 12; *Spofford* v. *Kirk,* 97 U. S. 484; *United States* v. *Gillis,* 95 U. S. 407. We do not pause to inquire with reference to all the cases whether the necessities of the judgment were as broad as the words of the opinion. Thus, in *National Bank of Commerce* v. *Downie, supra,* to give a single illustration, where the controversy was between the trustee in bankruptcy of the contractor and prior assignees, the claims against the Government which were the subject of the assignment had never been allowed, much less collected, though the decision cannot be said to have been put on that ground. Another line of cases exhibit an opposing tendency. *Lay* v. *Lay,* 248 U. S. 24; *Portuguese-American Bank* v. *Welles,* 242 U. S. 7, 11, 12; *McGowan* v. *Parish, supra; Freedman's Saving & T. Co.* v. *Shepherd,* 127 U. S. 494, 506; *Hobbs* v. *McLean, supra; Bailey* v. *United States,* 109 U. S. 432, 439; *Goodman* v. *Niblack,* 102 U. S. 556, 559; *McKnight* v. *United States, supra; Erwin* v. *United States,* 97 U. S. 392. Cf. *York* v. *Conde,* 147 N. Y. 486; 42 N. E. 193, dismissed 168 U. S. 642. These cases teach us that the statute must be interpreted in the light of its purpose to give protection to the Government. After payments have been collected and are in the hands of the contractor or subsequent payees with notice, assignments may be heeded, at all events in equity, if they will not frustrate the ends to which the

prohibition was directed. See *Lay v. Lay, supra,* aff'g 118 Miss. 549; 79 So. 291. To the extent that the two lines of cases are in conflict, the second must be held to be supported by the better reason. Many an analogy from fields uncovered by the statute reinforces that conclusion. An assignment ineffective at law may none the less amount to the creation of an equitable lien when the subject matter of the assignment has been reduced to possession and is in the hands of the assignor or of persons claiming under him with notice. *Western Union Telegraph Co. v. Shepard,* 169 N. Y. 170; 62 N. E. 154; *Walker v. Brown,* 165 U. S. 654; *Fourth Street Bank v. Yardley,* 165 U. S. 634; *Ketchum v. St. Louis,* 101 U. S. 306. All this is familiar law. No reason is discoverable in the policy of the statute why the analogy should be rejected in its application to the case at hand. Far from defeating or prejudicing the interests of the Government, the recognition of the equities growing out of the relation between the contractor and the surety will tend, as already has been suggested, to make those interests prevail. Cf. *Equitable Surety Co. v. McMillan,* 234 U. S. 448, 456. It would be a strange construction of the statute that would make it necessary for the Government to declare the equities illusory when they serve its own good.

In what has been written we have assumed that the failure to pay materialmen was a default of such a nature as to impose a duty on the contractor to turn over the payments to the surety upon appropriate demand. There is argument to the contrary. According to that argument the moneys were to be assigned in the event of default in the performance of the contract between the contractor and the Government, and not upon the failure to pay persons other than the Government who had claims against the contractor for materials or labor. But the statute directs that a bond for the prompt payment of

materialmen and laborers shall be executed by the contractor before the commencement of the work. Not only that, but the contract with the Government, which was drawn in the standard form, is a confirmation and adoption of the statutory duty. The terms of the bond are read into the contract, and there is default under the contract when there is default under the bond.

We conclude that Martin's interest in the fund was correctly held to be subordinate to the interests of other claimants. Without denying the possibility of arriving at the same conclusion through other avenues of approach, we follow the pathway that has been marked in this opinion.

The decree should be

*Affirmed.*