**TOWN OF AMHERST et al. v. UNITED STATES.**

Civ. A. No. 3213.

District Court, W. D. New York.
Jan. 22, 1948.

Gibbons, Pottle & O'Shea, of Buffalo, N. Y. (John E. Adamson, Jr., of Buffalo, N. Y., of counsel), for plaintiffs.

George L. Grobe, U. S. Atty. of Buffalo, N. Y. (Michael J. McMorrow, Asst. U. S. Atty., of Buffalo, N. Y., of counsel), for defendant.

KNIGHT, District Judge.

Town of Amherst, a municipal corporation of Erie County, New York, and its insurance carrier sue defendant to recover property damages under the Federal Tort Claims Act, 28 U.S.C.A. § 931.

The evidence at the trial disclosed that early in the morning of December 13, 1945, on Main Street in the Village of Williamsville, within the plaintiff town, a collision occurred involving the town's automobile driven east by its police lieutenant and a panel truck owned by the United States and being driven west by a radio engineer of the Civil Aeronautics Administration.

The statute on which this action is based adopts "the law of the place where the act or omission occurred." This would be the New York Vehicle and Traffic Law, Consol. Laws, c. 71, which provides in part as follows:

"Sec. 82: 1. When in the performance of duty the following vehicles shall have the right of way: * * * police * * * but this shall not relieve the driver or owner of any such vehicle from liability for injuries inflicted in consequence of the arbitrary or careless exercise of this right."

"Sec. 82: 5. The vehicle having the center line of the highway on its left shall have the right of way. In meeting both vehicles shall keep to the right, and this without regard to the center line of the highway. Slowly moving vehicles must be kept as near to the curb as practicable."

The police lieutenant was driving "in the performance of duty", responding to a fire alarm. The radio engineer, after eating a meal and drinking three bottles of beer, was on his way home.

Garrison Road enters Main Street from the south. The radio engineer was driving west on Main Street and intended to turn left into this intersecting road. The collision happened before he reached it. Just before the collision he had turned to his right and the police lieutenant had turned to his left.

The police lieutenant testified that he saw the panel truck approaching him on the

south side of Main Street about two city blocks distant. He then sounded his rotary siren and reduced his speed to about 15–20 MPH. As he neared Garrison Road and the panel truck going west was still on the south side of the highway and about 75 feet from the police car, he again sounded the siren. He testified:

"This car kept coming towards me. Q. Slow or fast? A. No, I wouldn't say he was going fast, but he was approaching me so that I made a sharp turn to the left and stepped on the gas to get away from this car, and the driver of the other car did the same thing, and that is where we met head on. * * * He turned to the right while I turned to the left * * * about the same time." He said the highway at this place was about 40 feet wide.

On cross-examination the police lieutenant, who had been called as a witness for plaintiffs, said:

"Q. Did this other car turn to the right at the same time that you turned to the left? A. Yes, that is right.

"Q. Did you notice him turning to the right as you turned to the left? A. No, I didn't notice him then.

"Q. When did you first know that he apparently had swung to the right and that you were meeting? A. Just when we met."

Witness further said:

"Q. Why couldn't you turn into Garrison on the right? A. Because I was going straight ahead.

"Q. The road was bare and you saw this other car approaching you. Why couldn't you turn into Garrison? A. This other car was past the other side of Garrison and I was under the impression that he was pulling into a driveway. It occurs a lot of times. That is the only reason * * *.

"Q. Was there any signal of any kind given by the other car? A. No, sir, nothing.

"Q. Up to that time did the other car deviate at all or did it come right along toward you in a straight line? A. It came in a straight line.

"Q. So that at no time it deviated one way or the other until the very last minute? A. No, sir * * *.

"Q. At any rate after you swung to the left you found that the Government car was over there too? A. Yes, I could see the car in front of me, it was so close when he swung to the right. We were still about both on the south side of Main Street * * *. I sharply swung to the left and gave her the gas."

On redirect examination he said: "I swung to the left, and the next thing I knew I saw that car right in front of me when we collided." He did not have time to apply the brakes. It was his intention to pass to the left of the Government truck and continue on to the fire.

The radio engineer testified he was coming home from work, driving about 20 MPH. "I always take the same route when I am traveling on Route 5, Main Street in Williamsville. I turn over on Garrison Road to go over to Cayuga Drive to go over to Genesee Street." He first saw the police car about two city blocks distant, traveling on its "side of the road towards the center line." Witness was driving on the north part of the road, with his "windows closed. I didn't give any signal at all to make a turn." He said the collision occurred about 150–200 feet east of Garrison Road. He further testified: "As I said I was about 300 feet away when I was intending to make a left-hand turn. I saw this car coming at a rapid rate of speed and, in the meantime I edged toward the center, but I did not cross the center of the highway on this Main Street. I saw this car coming at me, so that I turned to my right and, as I did, it seemed that he lost control of his car or hit an icy spot * * *. This car was coming at me so that I turned to my right. Q. At that time was this car that was coming at you—was this car still on his proper side of the street? A. No, it looked like he was over the center of the line." He thought the police car crossed the line about 100 feet due east of Garrison Road.

"Q. At that point when he crossed the line what did you do? A. I don't remember. The accident happened.

"Q. When did this swerving to the right on your part take place? A. I swerved to the right when I saw this other car approach me in the center and it looked like we were going to hit, so that I turned to my right to avoid an accident.

"Q. And at that time was the police car entirely across the line on your side of the street, or was it only partly across? A. Partly across * * *. It was at an angle. I would say his front wheels were across the line."

The radio operator further testified: "I was traveling in the lane towards the center line * * *. Q. Was there anything to prevent your going into the lane to the extreme right? A. No, sir."

On cross-examination he admitted that, after quitting work at 11:15 P.M., he went to an eating establishment where he had a meal. "Q. Did you have anything intoxicating to drink there? A. Yes, sir, I did * * *. I had three bottles of beer * * *. I had beer with my meal and I had coffee after I had my meal."

Radio operator further said:

"Q. When you turned to your right what lane were you in? A. I was just turning away from the center lane * * *. Q. Where were your left wheels with relation to the center line just before you started to turn to the right? A. I would say about three feet * · * * on the north side." The police lieutenant was "close to the center line" still on his own side. "When I turned right the car was coming at me. It looked like he lost control of his car. That is the reason I turned right to avoid the accident. * * * Q. At what point were both of his wheels north of the center line, before you began to turn or at the time of the accident? A. Right when I started to make my right hand turn."

In his testimony before the Commissioner of Motor Vehicles taken shortly after the accident, the radio operator had said:

"I tried to swing to my left to keep from getting hit broadside on my right. I couldn't get out of the way so that I turned to my right to avoid getting hit broadside; it was almost head on."

At the trial, he said in response to questions by the court:

"Q. And if that is true that you turned left I suppose then you would have gotten over the center line, wouldn't you? A. Yes, I would have * * *. Q. You turned over from the center lane in order to turn into Garrison Road? A. Yes, sir."

On recross-examination he said:

"Q. Then you can't swear positively, can you, that you at no time got across that center line? A. That is right."

Witness Chambers, the only person other than the two drivers, who actually saw the collision which happened in front of his house about 30–35 feet, east of the center line of Garrison Road, did not see the Eastbound police car until it was about three feet from the panel truck and only saw the latter move 25–30 feet from the east to the place of collision, which occurred entirely north of the center line of Main Street.

Witness Beeman, who did not see the actual collision, saw both vehicles as they approached each other. He said the eastbound police car was entirely on its right side of the highway but that the Government truck was on its wrong side "about two-thirds the way across the white line;" that, after the accident, the police car was entirely on its own side of the street. He said he heard the siren of the police car.

■■■■ No further quotation from the testimony is required. The police lieutenant was responding to a fire alarm "in the performance of duty." He had the right of way and there is no convincing evidence that his turning to the left, under the circumstances, was an "arbitrary or careless exercise of this right." The collision was caused solely by the negligence of the Government radio operator.

In the complaint, the insurance carrier, as subrogee, demands judgment against the Government for $618.38 and the town for $120.

The attorneys of the parties have stipulated in writing that the insurance carrier indemnified the town "in the amount of $618.38, and has become thereby subrogated to the claim of the Town of Amherst in said amount; that the sum of $50.00 remains the claim of plaintiff, Town of Am-

herst * * * Fourth: That the Manager of Read Motors Company * * * if called as a witness, would testify that the fair market value of material and labor for the repair and transfer of radio equipment from the 1946 Ford automobile, owned by plaintiff, Town of Amherst, amounts to the sum of $70.00."

After the trial had been concluded and while a decision was pending, the defendant moved to re-open the case and for an order striking the name of the plaintiff, General Insurance Company, as not being a proper party plaintiff. The motion to re-open was granted, because it was claimed the plaintiff, General Insurance Company, was a subrogee and as such had no right to bring suit against the United States under the Federal Tort Claims Act, and because there seems to be a conflict in the decisions of some of the District Courts.

█ While it is true that the Federal Tort Claims Act, 28 U.S.C.A. § 931, "since it is a relinquishment of a sovereign immunity, must be strictly interpreted" (United States v. Sherwood, 312 U.S. 584, 590, 61 S.Ct. 767, 771, 85 L.Ed. 1058,) (see also Munro v. United States, 303 U.S. 36, 58 S.Ct. 42, 82 L.Ed. 633; Wallace v. United States, 2 Cir., 142 F.2d 240; Defense Supplies Corp. v. United States Lines Co., 2 Cir., 148 F.2d 311), there is nothing in the wording of the Act which expressly or impliedly excludes the plaintiff, General Insurance Company of America, from suing on a claim based on subrogation. By the Act the District Court is expressly granted "jurisdiction to hear, determine, and render judgment on any claim against the United States, for money only, * * * on account of damage to or loss of property or on account of personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, *under circumstances where the United States, if a private person, would be liable to the claimant for such damage,* loss, injury, or death in accordance with the law of the place where the act or omission occurred." (Italics mine.)

In the most recent case reported on the question at issue, Hill v. United States, D.C., 74 F.Supp. 129, the court held that an automobile indemnity insurer which had paid its liability to insured for damages from collision between an automobile and an army truck was a real party in interest in the prosecution of a subrogation claim against the United States under the Federal Tort Claims Act. This case is directly in point here.

Charles Grace and Carlton Grace, to their own use and to the use of the Grangers Mutual Insurance Company v. United States of America and Pvt. Milton G. Nauman, decided September 26, 1947, D. of Md. (unreported) concerned a suit under the Federal Tort Claims Act. There was no opinion in the case, but the government's motion to dismiss was denied and the statement of the court on the hearing on the motion clearly indicated that the insurer was properly made a party to the suit. This case, as stated by the defendant, is distinguishable in certain respects, but Judge Chesnut, who rendered the decision in the Grace case, supra, wrote the opinion in Englehardt v. United States, D.C., 69 F.Supp. 451, 453, and gave a thorough discussion of the Federal Tort Claims Act. In the Englehardt case the suit was against the United States and another defendant, and the Judge decided that the United States had consented to be sued even though the individual defendant would be entitled to a trial as to him by a jury. Referring to the Federal Tort Claims Act and comparing it with the Admiralty Act, 46 U.S.C.A. § 741 et seq., the Judge said: "Both Acts clearly indicate that it was the intention of Congress to waive its sovereign immunity from suit; and to permit the maintenance in the district court of suits against the United States in cases where there would be liability on individuals in like circumstances."

In Rusconi, as Administrator, et al. v. United States of America, D.C., S.D.Cal., 74 F.Supp. 669, cited by defendant, the decision was based on two grounds, both taken by the defendant herein. One was that the Act (Federal Tort Claims Act) does not expressly grant consent by the government to be sued by a subrogee. This court disagrees with this conclusion. With the second ground there is no dissent.

In Charles McCasey and Michigan Fire and Marine Insurance Co. v. United States of America, E.D. of Mich.,[1] decided March 10, 1947, it was held that 31 U.S.C.A. § 203, infra, had not been complied with, but the decision does not show that the suit was brought under the Federal Tort Claims Act and hence is of no benefit here.

 Section 203, supra, does not bar an action under the Federal Tort Claims Act. This section is applicable only to contract claims. Here, under stipulation of parties the insurance company became subrogated to the claim of the town to the amount of $618.38, by operation of law. Brooks v. Mandel-Witte Co., 2 Cir., 54 F.2d 992, certiorari denied 286 U.S. 559, 52 S.Ct. 641, 76 L.Ed. 1292; Mobile & Montgomery R. Co. v. Jurey & Gillis, 111 U.S. 584, 4 S.Ct. 566, 28 L.Ed. 527; Liverpool & Great Western Steam Co. v. Phenix Ins. Co., 129 U.S. 397, 9 S.Ct. 469, 32 L.Ed. 788; National Bank of Commerce v. Downie, 218 U.S. 345, 31 S.Ct. 89, 54 L.Ed. 1065, 20 Ann.Cas. 1116. Clearly the right of subrogation by operation of law was in the insurer.

Brooks v. Mandel-Witte Co., supra, cites numerous cases to this effect. It has been many times held by the Supreme Court that Section 203, supra, "does not embrace the transfer of a claim against the United States, where the transfer has been by operation of law, not merely as the result of a voluntary assignment by the claimant." National Bank of Commerce v. Downie, 218 U.S. 345, 356, 31 S.Ct. 89, 92, 54 L.Ed. 1065, 20 Ann.Cas. 1116. In Morgenthau v. Fidelity & Deposit Co. of Md., 68 App. D.C. 163, 94 F.2d 632, the court said: " * * * R.S. § 3477, as amended, 31 U.S.C.A. § 203, * * * has never been construed to apply to assignments by operation of law." The purpose of Section 203, supra, may be said to be "to protect the Government against the danger of conflicting claims and multiple liability." National Refining Co. v. United States, 8 Cir., 160 F.2d 951, 954, Martin v. National Surety Co., 300 U.S. 588, 57 S.Ct. 531, 81 L.Ed. 822. Here there are no conflicting claims as between the parties plaintiff. The amount of the liability is fixed by the court and the total of that liability paid and amounts fixed by stipulation of the parties. All of intended requirements of the statute as to the law relative to the anti assignment claims have been met.

It is held that the insurer is a proper party plaintiff herein, and that the plaintiffs have established their causes of action by a fair preponderance of the evidence.

Judgment may therefore be entered for the plaintiff, General Insurance Company of America, against the defendant in the amount of $618.38 and for the plaintiff, Town of Amherst, against the defendant in the amount of $120, together with costs as provided in 28 U.S.C.A. § 931(a).

---

[1] No opinion for publication.