**In the Matter of DUTCHER CONSTRUC-TION CORPORATION, Bankrupt.**

**No. 265, Docket 30809.**

United States Court of Appeals
Second Circuit.

Argued Jan. 25, 1967.

Decided June 14, 1967.

Raymond T. Miles, Buffalo, N. Y., for appellant, Chester A. Pearlman, Trustee in Bankruptcy of Dutcher Construction Corporation, Bankrupt.

Mark Turner, Buffalo, N. Y. (Brown, Kelly, Turner, Hassett & Leach, Buffalo, N. Y., on the brief), for respondent, Reliance Insurance Company.

Before MOORE and FRIENDLY, Circuit Judges, and BRYAN,* District Judge.

MOORE, Circuit Judge:

Appellant, Chester A. Pearlman (hereinafter, Trustee), is the Trustee in Bankruptcy of Dutcher Construction Corporation (Dutcher) which was adjudicated a bankrupt on August 30, 1956. Appellee, Reliance Insurance Company (Reliance) is an insurance corporation organized under the laws of Pennsylvania.

On April 13, 1955, Dutcher contracted with the United States of America, Corps of Engineers, to perform construction work relating to the Saint Lawrence Seaway as provided in contract No. DA–30–023–eng–339. In the contract was a pro-

* Of the Southern District of New York, sitting by designation.

vision for "Changed Conditions." Pursuant to 40 U.S.C.A. § 270a Dutcher procured payment and performance bonds, in the respective amounts of $879,137.20 and $1,098,921.50, with Dutcher as principal and Reliance as surety.

Because of unforeseen construction difficulties, Dutcher was unable to complete the work within the required time and the Corps of Engineers terminated the contract with Dutcher's consent on April 11, 1956. The work was satisfactorily completed by another firm.

At the same time, Dutcher ran into financial difficulties and could not pay all its debts. In compliance with its bond obligations, Reliance paid $349,172.81 to laborers and materialmen satisfying all of Dutcher's debts for labor and materials supplied to the Saint Lawrence project.

The government had withheld from the monthly progress payments to Dutcher $87,737.35 as a retainage fund provided for in the prime contract. Prior litigation between these parties determined that Reliance was entitled to this fund. Pearlman v. Reliance Insurance Company, 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed. 2d 190 (1962).

The difficulties which prevented Dutcher from performing the contract in the allotted time also resulted in the actual cost of work done by Dutcher exceeding the estimated cost by a substantial amount. Under date of May 19, 1958, the Trustee presented a claim against the United States (Corps of Engineers) "for additional costs incurred in connection with the performance of the [contract]." The basis of the claim was stated to be that Dutcher had encountered "changed conditions" as specified in the contract and that

> "the material encountered was far more difficult to excavate than was to be expected, as well as more difficult to handle. Furthermore, it was not suitable for haul road construction nor for hauling over when placed in embankment or wasted in spoil areas. * * * "

The Trustee asserted that this "constituted Changed Conditions within the meaning of Article 4 of your form of Contract" and that the "Government represented and agreed that under such a situation an Article 4 Change Order would be negotiated."

In addition, the Trustee asserted that, irrespective of Changed Conditions, the Government had represented and warranted to Dutcher that the material was of a certain type and suitable for certain purposes; that the material was not as warranted; and that consequently Dutcher was entitled to reimbursement for the additional costs. The letter also stated that the Trustee had reason to believe the Corps of Engineers knew that before entering into the contract with Dutcher, the material was not as represented.

Pursuant to the "Changed Conditions" clause of the prime contract and its being "in the best interest of the Government to modify said contract in certain particulars," a Change Order dated October 6, 1960, was negotiated wherein "the total estimated contract price [was] increased by the lump sum amount of $185,687.46," in order to reflect the "[p]ayment for the increased cost of performance of the contract resulting from the changed conditions. * * * "

The Change Order made specific reference "to Article 4, 'Changed Conditions,' of your Contract No. DA–30–023–eng–339, dated 13 April 1955" and called for acceptance by Dutcher's Trustee. The Trustee accepted in an endorsement which read "The foregoing modification of said contract is hereby accepted." Reliance also agreed that its bond would cover the contract as modified.

In addition, the time of performance of the contract was "extended to and including 11 April 1956." This released liquidated damages in the amount of $11,000 previously withheld from earned contract moneys and retained by the Government by reason of Dutcher's failure to complete the performance within the originally required time. Finally, as the Change Order constituted final set-

tlement of the claim, the balance of the earned contract money withheld by the Government, $100 became payable to the Trustee.

The total amount payable to the Trustee by virtue of the Change Order was, then, $196,787.46. The orders of the Bankruptcy Court of October 26, 1960, and January 6, 1961, authorizing the settlement and receipt of payment by the Trustee contained the proviso that the rights of the surety to the $196,787.46 fund should be prejudiced in no way by such payment, and that for purposes of determining those rights, the fund should be treated as if it were still in the hands of the government. These orders also provided that the fund would be subject to certain expenses involved in reducing it to possession. After deduction of those uncontested expenses, the fund now amounts to $132,619.71.

Reliance claims that the fund represents money earned by and owed to Dutcher under the prime contract, and that by virtue of paying Dutcher's remaining debts under the contract, in the amount of $349,172.81, Reliance became the equitable owner of the fund, having a right to it prior to that of the Trustee. Reliance also claims that the fund is not subject to any further administrative expenses.

The Trustee asserts that the fund represents the settlement of a claim against the United States for fraud in the inducement; that the fund arose solely through the efforts of the Trustee; and that the fund should pass into the bankrupt's estate to be distributed according to the bankruptcy laws.

We disagree with the Trustee's characterization of the fund in controversy. We feel that the fund is precisely what it appears to be: an increase in the contract price negotiated by the government pursuant to a promise in the Changed Conditions Clause of the original contract in recognition of the fact that the conditions encountered were substantially different from those anticipated, thereby rendering the work more costly to perform.

It seems highly unlikely that the United States would settle a claim for fraud, when such a claim would be unenforceable under 28 U.S.C.A. § 2680(h). Moreover, it is apparent that even the Trustee regarded the claim as arising under the Changed Conditions clause of the contract whether or not the Corps of Engineers had material information in its possession prior to the bidding which it did not reveal to Dutcher because in his claim, he stated: "Whichever way one looks at it, it seems to me that the subsequent information clearly demonstrates that the Bankrupt did, in fact, encounter 'Changed Conditions.' "

Thus, we view the fund established by the Change Order as monies earned by and owed to Dutcher under the prime contract. The Trustee also claims that even if Reliance is entitled to receive the fund, the fund should be subject first to general administrative expenses, including the cost to the Trustee of conducting the present litigation.

The Referee in Bankruptcy decided in favor of the Trustee on both claims. By orders dated August 30, 1965, and July 29, 1966, the District Court reversed the Referee and sustained the claim of Reliance to the fund, free from additional administrative expenses. From those orders of the District Court, the Trustee has appealed.

This case is not a dispute over the priorities of distribution in bankruptcy. What is at issue here is whether the fund is a part of the bankrupt's estate at all. The property interests of Reliance at the time Dutcher was adjudicated a bankrupt did not, of course, vest in the Trustee. Pearlman v. Reliance Ins. Co., 371 U.S. 132, 83 S.Ct. 232 (1962). If Reliance

"at the time of adjudication was * * either the outright legal or equitable owner of this fund, or had an equitable lien or prior right to it, this property interest of [Reliance] never became a part of the bankruptcy estate to be administered, liquidated, and distributed to general creditors of the bankrupt." 371 U.S. at 136, 83 S.Ct. at 234.

Consequently, the disposition of this case depends, initially, upon whether Reliance had "ownership of, an equitable lien on, or a prior right to this fund before bankruptcy adjudication." 371 U.S. at 136, 83 S.Ct. at 235.

In *Pearlman,* this court had held, 298 F.2d 655 (2 Cir., 1962), that laborers and materialmen had an equitable priority in funds earned by the contractor but withheld by the United States pursuant to a 10% retainage clause in the contract and that the surety who had paid the laborers and materialmen was subrogated to the priority and, hence, was entitled to the funds as against the Trustee in Bankruptcy.

The decision was by no means without precedent. See, Martin v. National Surety Co., 85 F.2d 135 (8th Cir. 1936), aff'd 300 U.S. 588, 57 S.Ct. 531, 81 L. Ed. 822 (1937); American Surety Co. of New York v. Westinghouse Electric Mfg. Co., et al., 75 F.2d 377 (5th Cir. 1935); Belknap Hardware & Mfg. Co. et al. v. Ohio River Contract Co. et al., 271 F. 144 (6th Cir. 1921); Greenville Savings Bank et al. v. Lawrence et al., 76 F. 545 (4th Cir. 1896). In fact, the issues in the *Pearlman* case, supra, centered not on whether such a priority had ever existed, but on whether that priority had been "affected or altered" either by the passage of the Miller Act in 1935 (49 Stat. 793 (1935); 40 U.S.C.A. § 2702 [or § 270a]) or by the decision of the Supreme Court in United States v. Munsey Trust Co., 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947). The Court held that it had not.

The Trustee asserts that this case differs from the first *Pearlman* case in that:

(1) the fund in controversy here is not a retainage fund, but the settlement of a claim against the government (and resisted by it) of fraud in the inducement; and

(2) the fund was not in existence at the time Dutcher was adjudicated a Bankrupt.

In Martin v. National Surety Co., supra, the Court specifically rejected a claim that the equitable rights of laborers and materialmen were limited to retained percentages. In that case, suppliers of labor and materials (and, consequently, the surety standing in their shoes) were held to have an equitable right to progress payments superior to that of one "who at best was a general creditor." While the Supreme Court chose to affirm that decision on narrower grounds, it specifically cautioned that its opinion was not intended to deny "the possibility of arriving at the same conclusion through other avenues of approach * * *." 300 U.S. at 598, 57 S.Ct. at 535. In National Surety Corporation v. United States, 133 F.Supp. 381, 132 Ct.Cl. 724 (1955), the court indicated that sureties who pay under bonds are always superior to assignees, and also that the government's equitable obligation to pay laborers and materialmen gives it a right to use all money due the contractor for this purpose:

"There would seem to be no doubt of the right of the United States to use the contractor's money in its hands to discharge the contractor's obligations to laborers and materialmen. One of the obligations assumed by the contractor under his contract with the United States was to pay laborers and materialmen. If he fails to do so, the United States has the right to use money due him to do what he agreed to do." 133 F.Supp. at 384. * * *

"Since the United States is under an equitable obligation to see that laborers and materialmen are paid, as held in the *Henningsen* case [Henningsen v. United States Fidelity & Guaranty Co., 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547], the laborers and materialmen have the equitable right to assert a claim to moneys in the hands of the [government] which are due the contractor." Ibid.

Also cited in *Pearlman* footnote 23 (371 U.S. at 141, 83 S.Ct. 232, 9 L.Ed.2d 190) was Continental Cas. Co. v. United States, 169 F.Supp. 945, 145 Ct.Cl. 99

(1959). There the surety who paid laborers and materialmen on a payment bond was allowed to recover sums owing to the contractor, prior to the trustee in bankruptcy. The court said that the surety, by satisfying the contractor's contractual obligation to pay laborers and materialmen, was subrogated to the United States' superior right to use the money due the contractor for this purpose: "The United States, in requiring the contractor to agree to pay its laborers and materialmen, and in requiring it to furnish a bond to insure that they would be paid, acquired a right against the contractor that they should be paid. We suppose that, if in such a situation the bondsman should * * * become insolvent so that it could not, if need be, pay the laborers and materialmen, the United States could withhold money otherwise due the contractor and pay them." 169 F.Supp. at 947.

In London & Lancashire Indem. Co. v. Endres, 290 F. 98 (8 Cir. 1923), the construction contract was fully performed but some laborers and materialmen were left unpaid. The surety paid them. The government then appropriated an additional $30,000 to compensate the contractor for the additional unanticipated costs of performance. The surety was held to have priority to this money over the trustee in bankruptcy.

California Bank v. United States F. & G. Co., 129 F.2d 751, 754–755 (9 Cir. 1942), also indicates that the Government, because of its equitable obligation to see that laborers and materialmen are paid, has "the right to retain, as security for their payment, the then unpaid part ($37,170.04) of the contract price [including retainages and an amount not "retainage" but simply due on the contract and as yet unpaid]; and appellee, when it paid the claims, became subrogated to that right." 129 F.2d at 754.

United Pacific Ins. Co. v. United States, 319 F.2d 893, 162 Ct.Cl. 361 (1963), decided after *Pearlman,* held that the surety who paid laborers and materialmen on payment bonds and completed performance under a performance bond was subrogated to laborers' rights under the former and the government's rights under the latter, and was thus entitled to a priority as to all money earned but as yet unpaid on the contract, whether a "retainage" or not.

■ Various courts, especially the Court of Claims, have frequently said that the right of the laborers and materialmen to be paid is prior to the corresponding right of general creditors. Thus, laborers and materialmen have an equitable lien on all the proceeds of the contract, and the government has an equitable obligation to see that they are paid, which obligation gives it the right to apply any and all proceeds due the contractor to this end. The reason for this equitable obligation rests on the principle that it would be unfair for the government to permit money to go to general creditors, whose services did not contribute to performance of the contract, when laborers and materialmen responsible for performing the contract remained unpaid. The result is to put the contractor, laborers and materialmen and general creditors in the same positions vis-a-vis the money due on the contract as they would have been had they contracted with a private party whose property was subject to mechanics' liens. See generally 71 Yale L.J. 1274 (1962); National Surety Corp. v. United States, 133 F.Supp. 381, 383–384, 132 Ct.Cl. 724 (1955).

Other federal decisions indicate that the equitable rights of laborers and materialmen extend to all monies earned by the contractor under the contract but remaining in the hands of the government.

In Belknap Hardware & Mfg. Co. et al. v. Ohio River Contract Co. et al., supra, in a dispute between the suppliers of labor and materials for the government contract and the general creditors of the contractor, the laborers and materialmen were held to have an equitable right to the "balance due from the government." The balance due was $98,-674.64 and, as the retainage fund provided for in the contract had a maximum of $75,000, part of this balance must have

consisted of monies other than the retainage fund. This fact passed without comment by the court.

In American Surety Co. of N. Y. v. Westinghouse Electric Mfg. Co. et al., supra, the dispute between suppliers of labor and materials and the surety who had already paid the penal amount of his bond was over a final payment of $2,775 by the government to the Trustee in Bankruptcy of the contractor. While the court referred to this payment as "the amount of 10 per cent. of estimates, retained pursuant to a provision of the contract" (75 F.2d 378), the court, Judge Sibley, dissenting, pointed out that the 10% retainage fund could amount to only $1,524, the inevitable inference being that the remaining $1,251 represented monies due under the contract but not retained pursuant to the retainage clause of the contract. The distinction between the two types of funds evidently did not impress the majority as significant, for they referred to a judicial recognition of "an enforceable equitable right of unpaid furnishers of labor or materials for [government contracts] in or to a *part of the contract price thereof remaining in the possession of the government* after the completion of that work by the contractor" (emphasis added). The laborers and materialmen prevailed. See also London and Lancashire Indemnity Co. of America v. Endres, supra; National Surety Corp. v. United States, 133 F. Supp. 381, 132 Ct.Cl. 724 (1955).

United States v. Munsey Trust Co., supra, does not preclude recovery by the surety here. In *Munsey,* the United States admitted that it owed the contractor $12,445.03 in retained percentages on one contract, but asserted, and this assertion was not contested, that the contractor was indebted to it in the amount of $6,731.50 on other transactions. The United States paid all but $6,731.50 of the retained percentages to the contractor's receiver, retaining the latter sum. The surety sought to recover from the United States part of the retained $6,-731.50 without contesting the contractor's indebtedness in that amount.

In *Pearlman,* the Supreme Court clearly defined the limitations of its decision in the *Munsey Trust* case by stating that there they had held that the United States could "exercise the well-established common-law right of debtors to offset claims of their own against their creditors. This was all we held." 371 U.S. at 140, 83 S.Ct. at 237, 9 L.Ed.2d 190. Thus, the *Munsey* decision seems to us to be nothing more than an application of the rule that at any given moment in time, the rights of laborers and materialmen to monies in the hands of the government are no greater than the rights of the contractor himself to those same funds.

In summary, the facts are clear that the $196,787.46 payment by the Government was made under, pursuant to, and in modification of the original contract. Just as the surety was held to be entitled to the retainage fund in the first *Pearlman* case, so here the avails of the contract should be recoverable by the surety which has paid out some $349,172.81 on Dutcher's debts under the contract *to laborers and materialmen.* This does not inflict any injustice on the general creditors since until the contractor had satisfied its obligations to laborers and materialmen, it would have had no avails from the contract for general purposes.

As to administrative expenses, it is provided in 11 U.S.C. § 102 that they "shall be paid or allowed out of the estates in which they were incurred." The effect of our holding that Reliance had a prior right to the fund in question is that the fund never became part of the bankrupt's estate. See, Pearlman v. Reliance Ins. Co., supra, 371 U.S. at 136, 83 S.Ct. 232. Thus, the administrative expenses should not be assessed against this fund. This is not to say that the Trustee should not be allowed to recover the necessary expenses of litigation or a commission for handling this fund under 11 U.S.C. § 76, sub. c.(1), but simply that these allowances must be paid out of the general estate, and not out of the fund belonging to Reliance. There is no claim

that the general estate is not sufficient to pay the Trustee. Under these circumstances, In re Toole, 294 F. 975 (D.C. S.D.N.Y.1920), at pp. 977–978 supports our decision not to deduct administrative expenses from the fund belonging to Reliance.

Affirmed.