In re ALTEK SYSTEMS, INC., Debtor.

GENERAL CABLE COMPANY, a division of GK Technologies, Inc., Plaintiff,

v.

ALTEK SYSTEMS, INC., Old Second National Bank of Aurora; and Pioneer Bank and Trust Company, Defendants.

Bankruptcy No. 80 B 3492.
Adv. No. 80 A 151.

United States Bankruptcy Court,
N. D. Illinois, E. D.

Sept. 18, 1981.

Richard Franklin, Baker & McKenzie, Chicago, Ill., for General Cable.

Gerald Munitz, Nachman, Munitz & Sweig, Ltd., Chicago, Ill., for Pioneer Bank.

Louis Levit, Levit & Miller, Chicago, Ill., for Altek.

William H. Wake, Aurora, Ill., for Old Second National Bank.

## MEMORANDUM AND ORDER

ROBERT L. EISEN, Bankruptcy Judge.

This matter came to be heard on cross-motions for summary judgment filed by The General Cable Company (General Ca-

ble), the debtor, Altek Systems, Inc. (Altek) and the Pioneer Bank and Trust Company (Pioneer Bank). This case is ripe for decision because the parties have stipulated to the relevant, material facts; thus there is "no genuine issue as to any material fact."[1]

General Cable initiated this matter through a complaint to determine the validity, priority and extent of a lien or other interest in property. On February 20, 1981 an order was entered allowing Pioneer Bank to intervene as a party defendant. One of the original defendants, Old Second National Bank of Aurora, holds the disputed funds as a stakeholder and awaits the court's direction regarding the disbursement of said funds. The court having researched the issues presented, having considered all memoranda filed and being fully advised in the premises, does hereby make the following findings of fact and conclusions of law.

The instant case contains two separate and distinct disputes. Part I sets forth findings of fact and conclusions of law governing the dispute between General Cable and Pioneer Bank concerning their competing claims to the funds held by Old Second National Bank of Aurora (Old Second). Part II sets forth findings of fact and conclusions of law governing the dispute between General Cable and Altek concerning their respective claims to setoff and turnover of property.

## PART I.  SECURITY INTERESTS

### FINDINGS OF FACT

On or about June 29, 1977, Altek and Pioneer Bank executed a Security Agreement by which Altek granted Pioneer Bank a security interest in "all Accounts Receivable of Debtor (Altek) now existing or hereafer (sic) arising or acquired" and "all proceeds...of the foregoing." (Stipulation, ¶ 5, Plaintiff's Motion for Summary Judgment, Exhibit A, page 3). On June 20, 1979 Altek duly executed and Pioneer Bank duly filed with the Illinois Secretary of State a UCC–1 Financing Statement. The Financing Statement declares:

This financing statement covers...All Accounts Receivable...whether now existing or hereafter created. (Stipulation, ¶ 6).

Sometime in March 1979, Altek and the United States of America (United States) duly executed a contract under which Altek would supply the United States with cable/or copper to be used by the United States in a major defense project. General Cable was Altek's primary supplier or subcontractor under the contract.

Subsequently, in December 1979 Altek assigned to Old Second, Account # 65–740–3, all of Altek's rights in and to money due Altek from the United States pursuant to their contract. (Stipulation, ¶ 9(a)). Altek also executed and delivered to Old Second a letter of direction and an amendment thereto, directing Old Second to disburse all sums in Account # 65–740–3 received from the United States to General Cable. The letter of direction and amendment thereto granted General Cable a preferred position so that General Cable could receive 100% payment of their invoices. (Stipulation, ¶'s 9(b) and 11).

The United States, pursuant to the assignment, paid to Old Second Account # 65–740–3 funds due under the contract in the amount of $28,752. Said funds constitute the current balance of Account # 65–740–3. (Stipulation, ¶ 15).

Altek currently owes Pioneer Bank more than $28,752. (Stipulation, ¶ 7). General Cable contends that Altek is currently indebted to General Cable in an amount in excess of $28,752.

## DISCUSSION

General Cable and Pioneer Bank are competing claimants for the $28,752 currently in Account # 65–740–3. (The Account). Since it is not a party, the liability of the United States, if any, is not an issue. Old Second, as stakeholder, takes no position regarding who is entitled to the account.

1.  Federal Rules of Civil Procedure, 56(c).

Altek contends that Pioneer Bank and not General Cable is entitled to the account.[2] This controversy concerns the applicability *vel non* of Article 9 of the Uniform Commercial Code to the two transfers in question.[3]

The first transfer took place in June 1977 when the Pioneer Bank and Altek entered into a Security Agreement. As is customary among commercial lenders, the Pioneer Bank, after lending Altek $280,000 evidenced by a promissory note, sought to secure the repayment of Altek's debt. The agreement provided that all of Altek's inventory and accounts receivable, present and future, would be collateral for the performance of Altek's obligations. The U.C.C. defines "security interest" as "an interest in personal property...which secures payment or performance of an obligation." Section 1–201(37). Pursuant to U.C.C. terminology, Altek was the debtor and Pioneer Bank was the secured party. Altek's accounts receivable, present and future, were pledged as collateral in the security agreement and a security interest was thereby created.[4]

The second transfer took place in December 1979 when Altek assigned to Old Second its rights to payment under the contract with the United States and also directed Old Second to pay the sums received from the United States to General Cable. When Altek completed its performance under the contract, an account receivable was generated with the United States owing Altek money for the performance of Altek's obligations.[5] Pursuant to the assignment, the United States paid the money it owed Altek on the account receivable directly into the account. Altek was the assignor and Old Second was the assignee. General Cable was the third party beneficiary of the contract of assignment between Altek and Old Second. General Cable was also the pri-

mary supplier or subcontractor of Altek under the government contract. Therefore, whenever General Cable completed its performance under its contract with Altek, an account receivable was generated whereby Altek owed General Cable money as an account debtor.[6]

The issues are whether or not Article 9 of the U.C.C. applies to either or both of the above transfers. In other words, does Article 9 apply to a transaction where the debtor grants the secured party a security interest in all the debtor's accounts receivable in exchange for financing from the secured party? Secondly, does the answer to the above question change with respect to an account due from the United States Government subject to an assignment to a third party beneficiary subcontractor; i. e., is the latter an "account receivable" subject to the Altek-Pioneer Bank security agreement?

■ The court holds that Pioneer Bank has a valid and perfected security interest in all of Altek's accounts receivable, including the Government's contract. Article 9 applies whenever a transaction is intended to create a security interest in accounts. Section 9–102(1)(a). *See* also Uniform Commercial Code § 9–102. Pioneer Bank's security interest attached to the collateral and became enforceable pursuant to § 9–203. Pioneer Bank perfected its security interest by filing with the Illinois Secretary of State. § 9–302. Pioneer Bank's perfected security interest covered all of Altek's accounts receivable and proceeds thereof. The U.C.C. defines proceeds as that which is received upon collection of collateral. Section 9–306(1). The U.C.C. also provides that a security interest "continues in any identifiable proceeds..." Section 9–306(2). Therefore, Article 9 applies to the transfer between Altek and Pioneer Bank. Having

---

**2.** Altek desires to apply the funds to a secured rather than what it contends is an unsecured obligation.

**3.** Article 9 of the U.C.C. is made applicable in Illinois by virtue of S.H.A., ch. 26, ¶ 9–101 et seq. All further citations to the U.C.C. shall simply cite the applicable section.

**4.** Sections 9–105(1)(d), (m), (c) and (*l*).

**5.** In U.C.C. terms the United States became an "account debtor"; Section 9–105(1)(a).

**6.** Note N. 5 *supra.*

complied with all applicable sections of Article 9, Pioneer Bank also has an enforceable security interest in the account which contains the proceeds of the account receivable due Altek from the United States.

▪▪▪ Having found that Article 9 applies when a debtor grants a secured party a security interest in the debtor's accounts receivable, the court also concludes that Article 9 applies even though one of the accounts receivable happens to be on a contract with the United States Government under which the payable is assigned to debtor's subcontractor. As discussed, *supra*, Article 9 applies to transfers intended to create security interests in accounts receivable. As the introductory comment to Article 9 states:

> The basic structure of Article 9 is (1) the creation of a security interest with an *established priority* and (2) a means of giving notice of that interest to third parties.
>
>     *    *    *    *    *    *
>
> In the case of accounts receivable...*notice filing is the only means of perfection.* (emphasis added).

The funds in the account are indisputably proceeds of an account receivable. General Cable cannot claim a security interest in the account when Pioneer Bank had a previously perfected security interest in the funds that constitute the account. Section 9–312(5).[7] As the Uniform Commercial Code § 9–102, Comment N. 1 explains:

> ...The principle test whether a transaction comes under this Article is: is the transaction intended to have effect as security?.... When it is found that a security interest as defined in section 1–201(37) was[8] intended, this Article applies regardless of the form of the transaction or the name by which the parties may have christened it.
>
> An assignment of accounts...as security for an obligation is covered by subsection (1)(a).

In the instant case, the transfer attempted but failed to create a special security interest for General Cable in a specific account receivable due from the United States to Altek; The transfer failed to accomplish its purpose because of noncompliance with Article 9 requirements.

General Cable argues that both transfers in question are excluded from Article 9 coverage. General Cable cites § 9–104(a), (e) and (*l*) in support of its argument. The court finds General Cable's arguments creative but unpersuasive. As previously discussed, Section 9–104 is titled "Transactions Excluded From This Article", and

> Section 9–104 excludes certain transactions where the security interest...arises under statute or common law by reason of status *and not by consent of the parties*...

Uniform Commercial Code Section 9–102 Comment N. 1 emphasis supplied. In the instant case, General Cable attempted, *with Altek's consent*, to create a security interest in a specific account receivable due Altek while ignoring Article 9 requirements.

> The aim of this Article (9) is to provide a simple and unified structure within which the immense variety of present-day secured financing transactions can go forward with less cost and greater capacity.

Uniform Commercial Code Section 9–101 Comment.

▪▪▪ Specifically, General Cable contends that Pioneer Bank does not have a perfected security interest in the account because Article 9 does not apply to transfers of an interest in a deposit account.[9] In 1977, however, Altek did *not* attempt to transfer to Pioneer Bank an interest in a deposit account. Altek granted Pioneer Bank a security interest in all of Altek's accounts receivable, "whether now existing or hereafter acquired." The funds collected on an

---

**7.** "a) Conflicting security interests rank according to priority in time of filing or perfection. Priority dates from the time a filing is first made covering the collateral..."

**8.** As discussed, *supra*, a security interest "... secures payment or performance of an obligation."

**9.** Section 9–104(e).

account receivable, subject to a perfected security interest, continue to be subject to the security interest if the funds can be identified as proceeds of the account receivable.[10] It is irrelevant that the proceeds are now held in a deposit account.

■ General Cable also contends that since the funds in the account came from the United States, Article 9 does not apply. General Cable contends that Article 9 does not apply "to a transfer by a government." [11] The transfers in issue in the instant case are not transfers *by* the United States, they are transfers *by* Altek. Altek attempted to grant General Cable a security interest in one specific account receivable. The Uniform Commercial Code Section 9–104 Comment N. 5 states that:

Certain governmental *borrowings* include collateral in the form of assignments... Since these assignments are usually governed by special provisions of law, these governmental transfers are excluded from this Article. (emphasis added).

There is no governmental borrowing in the instant case, so § 9–104(e) is inapplicable, and Article 9 does apply to both transfers at issue herein.

■ Finally, General Cable argues that Article 9 does not apply

to a security interest subject to any statute of the United States to the extent that such statute governs the rights of parties to and third parties affected by transactions in particular types of property.[12]

Specifically, General Cable contends that the Assignment of Claims Act of 1940 (hereinafter Claims Act),[13] governs any attempted security interest in an account receivable due from the United States. However, the court believes that the purpose for which Congress passed the Claims Act has no relationship to the facts in the instant

case. The court holds that compliance with the Claims Act in the instant case cannot work to defeat a previously perfected security interest.

The Claims Act is a direct descendant of Revised Statutes § 3477, enacted in 1853 as part of a statute entitled "An Act to prevent frauds upon the Treasury of the United States." An early United States Supreme Court case and all subsequent cases, recognize that the Claims Act was "passed for the protection of the government." *Hobbs v. McLean*, 117 U.S. 567, 6 S.Ct. 870 at 874, 29 L.Ed. 940 (1886).[14] The Claims Act

was designed to protect the United States against frauds...and a multiplicity of conflicting claims... *not to regulate the equities of individual claimants as between themselves.* (emphasis added).

*United Pacific Insurance, supra* at n. 13, p. 970. As Justice Cardozo stated:

These cases teach us that the statute *must be interpreted in the light of its purpose* to give protection to the Government. (emphasis added).

*Martin v. National Surety Co.*, 300 U.S. 588 at 596, 57 S.Ct. 531 at 534, 81 L.Ed. 822 (1937).

In the instant case, the United States is not a party, is not in danger of being defrauded and there are no claims pending against it. The United States needs no protection. Thus, it would be incongruous to apply the Claims Act to defeat Pioneer Bank's previously perfected security interest. Compliance with the Claims Act causes the assignment of the claim to be *binding upon the United States.* It has no effect upon the equities of the individual claimants.

General Cable contends that *Iser Electric Co. v. Ingran Construction Co.*, 48 Ill.App.3d 110, 6 Ill.Dec. 136, 362 N.E.2d 771 (1977)

---

10.  Section 9–306(5).

11.  Section 9–104(e).

12.  Section 9–104(a).

13.  31 U.S.C. § 203.

14.  *See* also, *United States v. Aetna Surety Co.*, 338 U.S. 366, 70 S.Ct. 207, 94 L.Ed. 171 (1949); *United Pacific Insurance Co. v. United States*, 358 F.2d 966 (Ct.Cl.1966); *New York Guardian Mortgagee Corp. v. Cleland*, 473 F.Supp. 422 (1979).

supports its contention that it has an enforceable lien upon the account. This court would agree with the *Iser* court under the facts as presented in *Iser*. However, the *Iser* decision was based upon the fact that

> While there was a lien in favor of Iser through the garnishment proceeding, there was a *prior lien* in favor of Mercantile through the assignment.

*Id.* at 120, 362 N.E.2d 771 (emphasis added). In the instant case, Pioneer Bank, not General Cable, had the prior lien.

Finally, *Rivan Die Mold Corp. v. Stewart-Warner Corp.*, 26 Ill.App.3d 637, 325 N.E.2d 357 (1975) seems directly on point with the instant case. In *Rivan*, a Bank perfected a security interest in the accounts receivable of Logan. Subsequently, Logan and Rivan agreed that Logan would assign Rivan a portion of an account receivable due Logan from Stewart-Warner. The Bank and Rivan were competing claimants to the accounts receivable of Logan. The *Rivan* court, in language fully applicable in the instant case, held that:

> The Bank fully complied with all applicable provisions of the Uniform Commercial Code (cites omitted). Thus, the Bank perfected its security interest in Logan's accounts receivable. Before Stewart-Warner entered into an agreement with Rivan, it was incumbent upon it to check for financing statements on file against Logan. This is indeed a simple process.

For all the reasons discussed above, it is ordered that Summary Judgment shall be entered in favor of Pioneer Bank and against General Cable and it is hereby determined that Pioneer Bank has a validly perfected security interest in the funds in Old Second National Bank of Aurora, Account # 65–740–3, which is superior to that of General Cable and all other parties, and thus it is appropriate that this court does hereby order the funds held in said Account # 65–740–3 be turned over to Pioneer Bank.

## PART II.  SETOFF CLAIMS

### FINDINGS OF FACT

On March 25, 1980 Altek filed its petition for relief under Chapter 11 of the Bankruptcy Act. At that time, Altek owed General Cable $53,911.51 on General Cable Invoices Nos. 037–229 and 037–263.

Altek executed a purchase order dated December 12, 1979 authorizing General Cable to buy and hold 29,432 pounds of copper for Altek. On December 12, 1979 General Cable replied to Altek thanking Altek for its purchase order. On December 13, 1979 General Cable wrote to Altek that:

> Your order M700540 for the required 29,-432 (pounds) of copper has been completed, and the copper transferred to our plant. . . . The following will apply:
>
> 1. All delinquent invoices must be paid immediately.
>
> 2. The invoice covering the copper must be paid prior to any production or shipment.
>
> 3. We will continue shipments only as long as your account is kept current. At such time that any invoice becomes delinquent, all shipments will be held and production will be stopped.

(*See* Group Exhibit "B" attached to Altek's Answer). General Cable's Invoice No. 051–375 covered Altek's purchase order for the 29,432 pounds of copper. On or about January 18, 1980 Altek paid General Cable $31,-676.19 in full payment of Invoice No. 051–375. General Cable shipped and delivered to Altek about 10,292 pounds of copper worth about $11,076.59. However, General Cable retained about 19,140 pounds of copper worth about $20,599.60.

In April 1980 Altek returned rejected cable to General Cable having a value of about $629.95. In November 1980 General Cable issued its credit to Altek in the amount of $629.95. General Cable has paid no part of such credit to Altek. The rejected cable was part of the cable shipped to Altek pursuant to General Cable's invoice # 037–229.

Altek, by its counterclaim and motion for summary judgment, seeks turnover of cash or property having an aggregate value of about $21,229.55. General Cable, by its motion for summary judgment, seeks an order

allowing General Cable to setoff the cash or property with a value of about $21,229.55 against the indebtedness owed by Altek to General Cable.

## DISCUSSION

General Cable contends that the right of setoff is applicable in the instant case, while Altek contends that the right to setoff is subject to an exception that applies in the instant case. 11 U.S.C. § 553 provides in pertinent part that:

(a) ...this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case, except to the extent that:

\*    \*    \*    \*    \*    \*

(3) The debt owed to the debtor by such creditor was incurred by such creditor—

(A) after 90 days before the date of the filing of the petition:

(B) while the debtor was insolvent; and

(C) for the purpose of obtaining a right of setoff against the debtor.

General Cable wants to offset the $21,229.55 in cash or property that Altek seeks recovery of, from the $53,911.51 that Altek owes General Cable under Invoices Nos. 037–229 and 037–263. The $21,229.55 that Altek seeks is for goods paid for but not delivered.

This court holds that the right of setoff is appropriate and the exception contained in 11 U.S.C. § 553(a)(3) is inapplicable herein. When Altek filed its petition for relief it owed General Cable money and General Cable owed Altek property or money worth about $21,229.55. Altek has not proved each element stated in 11 U.S.C. § 553(a)(3). Thus, as a matter of law, General Cable is entitled to setoff the mutual debts. 11 U.S.C. § 553(c) creates a statutory presumption that the debtor is insolvent for 90 days preceding the filing of a petition, thus subsection (B) of 11 U.S.C. § 553(a)(3) is met. It is unclear if subsection (A) of 11 U.S.C. § 553(a)(3) applies because Altek has not proved whether General Cable's debt to Altek was incurred when the contract was entered into (December 12, 1979), when Altek paid for the goods (January 18, 1980), or when the goods were first shipped (not available from the records). However, the court holds that the debt General Cable owes Altek was *not* incurred "for the purpose of obtaining a right of setoff." As early as December 13, 1979 General Cable informed Altek that all shipments would stop once any invoice became delinquent or once Altek's account failed to be kept current. (*See supra*). As one commentator stated:

The circumstances under which this prohibition of setoff (§ 553(a)(3)) exists are those implying that the creditor attempted to obtain a preference or put itself in a preferred position relative to other creditors.

4 *Collier on Bankruptcy* ¶ 553.08(2) at 533–44 (15th Ed. 1979). In the instant case, General Cable did not incur the debt for the purpose of obtaining a right to setoff, but incurred the debt pursuant to the terms of its contract with Altek which was entered into on or about December 12, 1979.

WHEREFORE, IT IS HEREBY ORDERED that Summary Judgment shall and hereby is entered in favor of General Cable and against Altek on the counterclaim of Altek for the turnover of certain property.

IT IS FURTHER ORDERED that General Cable may setoff the $21,229.55 it owes Altek against the sum that Altek owes General Cable.