**GULF COAST WATER CO. v. CART-
WRIGHT et al.**

No. 11327.

Court of Civil Appeals of Texas. Galveston.

Feb. 26, 1942.

Strasburger, Price, Holland, Kelton & Miller, of Dallas, for appellant.

W. E. Davant, of Bay City, for appellee First Nat. Bank of Bay City.

F. C. Proctor, Jr., of Victoria, and Styles & Erickson, of Bay City, for all other appellees.

GRAVES, Justice.

The individual appellees, nine in number, were the Rice Farmers. All of them, except Dodd, filed suit against appellant, the Water Company, to have declared invalid, or inapplicable, a certain clause in their 1935 irrigation contracts with the Water Company.

The Water Company filed a plea in abatement, plea to the jurisdiction, general demurrer, special exceptions, and general denial to this suit.

It also filed cross-actions against four of the Rice Farmers, and original actions against the remaining five, in which it sought enforcement of the clause. Three of the first four Rice Farmers filed general demurrers and general denials to the cross-actions, and the last five answered the original actions with general demurrers, general denials, and an adoption of the allegations in the petition of the eight Rice Farmers against the Water Company.

All of these cases were consolidated and tried together.

There were involved two types of contract between the Water Company and the Rice Farmers, all having been made on or about January 21, 1935. Under the first type, for water only that was furnished by it, the Rice Farmers agreed to pay to the Water Company "a cash water rental equal to one-fourth of the gross proceeds derived from the sale of all rice grown upon lands farmed by" the Rice Farmers. Under the second type, for the land, seed, and water, all furnished by the Water Company, the Rice Farmers agreed to pay "one-half of the gross proceeds derived from the sale of all the rices grown upon lands farmed by" the Rice Farmers.

At the trial it was stipulated that the Water Company performed its obligations under the contracts with the Rice Farmers, and the only real controversy between the parties was with respect to the inclusion in the "gross proceeds derived from the sale of all the rices", of the amounts of benefit-payments received by the Rice Farmers for not planting rice, pursuant to agreements made by them on or about July 13, 1935, with the Secretary of Agriculture, concerning their rice acreage and production for the year 1935.

It was the contention of the Water Company that the amounts of these benefit payments should be included in such "gross proceeds", and that thereby the amount of rental due to it under such contracts would be increased by the sum equal to one-fourth (under the first type) and one-half (under the second type) of the amount of such benefit payments so received by the Rice Farmers.

It was appellees' contention, among others, that they had complied with their respective contracts with appellant in all respects when they paid it the one-half, or one-fourth, as the case might be, of the gross proceeds derived from the sale of the rice grown during the year 1935 by the respective Rice Farmers, and that the benefit payments received by them from the Government for not planting rice were not a part of the proceeds derived by them from the sale of the rices grown by them; that, even though the respective contracts with the Secretary of Agriculture were made after the water contracts with appellant, such water contracts were made subject to the Agricultural Adjustment Act, 7 U.S.C.A. § 601 et seq., and subject to the rules and regulations of the Agricultural Adjustment Act, and subject to the rules and regulations of the Agricultural Adjustment Administration and the Secretary of Agriculture.

Further, that the portion of the contracts relied upon by the Water Company as the basis for the increased rental was void, because it was (a) without any consideration; (b) lacking in mutuality; (c) discriminatory.

The case was tried without a jury, and, at the conclusion of the testimony, the court entered judgment denying the Water Company any recovery against any of the parties.

The material portions of the one-fourth type of contract are as follows: "In consideration of the agreement to furnish water as hereinbefore specified and of all other agreements herein contained, Second Party agrees to pay First Party a cash water rental equal to one-fourth of the gross proceeds derived from the sale of all rices

upon lands farmed by said Second Party watered hereunder whether said lands are specifically described by this contract or not. First Party will, at its cost and expense, furnish one-fourth of sacks, one-fourth of hauling and one-fourth of the storage of said crop of rice."

Those of the one-half type of contract are as follows:

"First Party does hereby lease and·let to Second Party all of the following described land * * *:

"Said lands being riparian to the canals of First Party and are to be planted and cultivated to rice by Second Party during the year 1935, and it is distinctly understood that only that portion of the lands above described that are actually planted and cultivated to rice shall be covered and included by this lease.

"In consideration for the furnishing of land, seed, and water by First Party, Second Party agrees to pay as a rental of said seed and water one-half of the gross proceeds derived from the sale of all of the rices grown upon lands farmed by said Second Party under the terms and conditions hereinafter set out."

The clause—common to both these one-fourth and one-half types of contract for 1935—that so formed the sole material bone of contention was, in his verbis, this: "By 'gross proceeds derived from the sale of all of the rices', as the same is used herein, is meant all moneys received from the sale and shall include payments made by the purchaser to the owner of the rices, payment made to the Secretary of Agriculture under any then existing 'marketing agreement for Southern Rice Milling Industry', and any allotment or benefit payment to which party of the Second Part shall be eligible under the rules and regulations of the Agricultural Adjustment Administration or the Secretary of Agriculture."

In support of its judgment, the able trial court substantially made these among other findings of fact and law:

"II. That each and all of the contracts between the Rice Farmers and Water Company were made in anticipation of and subject to the rules and regulations to be promulgated by the Secretary of Agriculture and/or the Agricultural Adjustment Administration by and under which the Rice Farmers would be eligible to receive benefit payments for reducing their rice acreage to the allotment and quota fixed by the Agricultural Adjustment Administration.

"III. That the Agricultural Adjustment Administration, on April 18, 1935, promulgated certain rules and regulations, among which being that the adjustment or benefit payments may not be assigned under any condition, same being forbidden by the contract between the Rice Farmer and the Secretary of Agriculture, as well as being prohibited by law; except, that the Rice Farmer could pledge such benefit payment in order to obtain funds or credit for carrying on the current operation of the farm; and that the expression 'Funds', or credit, for carrying on the current operation of the farm and 'current production credit' means funds or credit to meet any necessary expense of preparing of land, planting, cultivating, watering, harvesting and marketing of the rice crop grown in the year 1935.

"I find that the Water Company did not furnish any funds or credit or current production credit to any Rice Farmer during the year 1935; and that the water contract between the Rice Farmers and Water Company, wherein 'Gross Proceeds' is defined to include any allotment or benefit payments made to the eligible Rice Farmers under the rules and regulations of the Agricultural Adjustment Administration, or the Secretary of Agriculture, which water contract was made subject to such rules and regulations, and that such rules and regulations prohibited the Rice Farmer from assigning or pledging such benefit payments as might be made for any purpose other than for funds, or credit, or current production credit.

"IV. That the water contract between the Rice Farmers and the Water Company, taking the contract as a whole, was for the cultivation by the Rice Farmers of land to rice.

"V. That the Water Company furnished to other rice farmers who had not complied with the rice-reduction program, and who were not eligible to receive adjustment or benefit payments, land, seed, and water during the year 1935, for the respective one-half and one-fourth portions of the gross proceeds derived from the sale of the rice raised, knowing that such farmers were not complying with the Agricultural Adjustment Act and were not eligible to receive and would not receive any benefit payment for the 1935 season, and that the

only consideration such ineligible farmers would pay for land, seed, and water would be such proportions of the moneys received from the sale of the rice raised.

"VI. The Rice Farmer procured production credit from the Bank, or Warehouse, and furnished the money for not only his part of the expense, but the Water Company's portion of the expense of thrashing, sacks, and hauling its part of the crop, and after the Rice Farmer had paid it the Water Company reimbursed the Rice Farmer out of the moneys received from the actual sale of the rice; but in no instance did the Water Company furnish money or production credit to the Rice Farmer in advance.

"VIII. I find that none of the benefit payments of the Rice Farmers was ever paid into or went into the possession of either the Warehouse Company or the Banks, and that all moneys coming into the hands of the Warehouse Company and Banks from the sales of the rice grown by the Rice Farmer were distributed in accordance with the Water Contract; and that the Water Company in each instance was paid its proportionate part (one-half or one-fourth as the case might be) of the gross proceeds derived from the sale of the rice grown in 1935 by the Rice Farmer.

"Conclusions of Law.

"I. I conclude that while the provisions of the contract as to the adjustment or benefit payment to be received did not constitute, literally speaking, a pledge or assignment of the benefit payment, yet, including it in the definition of 'The gross proceeds of rice', and giving a lien on the rice to secure its payment, was an attempted assignment or hypothecation of the benefit payment itself, which would be in violation of the law and rules of the Secretary of Agriculture.

"II. I conclude that the inclusion of the benefit payments in the 'gross proceeds' clause, became, invalid upon promulgation of the rules by the Secretary of Agriculture and the Agricultural Adjustment Administration, in that the water contract was made in anticipation of the promulgation of and subject to such regulations under which the Rice Farmers would be eligible to receive benefit payments, and the provisions of the water contract must be construed in connection with whatever rules were promulgated. Therefore, as such regulations prohibited assignment, or pledge, or hypothecation, of the benefit payments, they necessarily rendered the hypothecation of the benefits unenforceable.

"III. I conclude that the part of the 'gross proceeds' clause in the water contract attempting to include a part of the benefit payments, is unenforceable, because it violates a rule of law, and is contrary to public policy, and void for want of mutuality;

"(1) It is contrary to the policy laid down in the Agricultural Adjustment Act, and the regulations of the Agricultural Adjustment Administration, and Secretary of Agriculture.

"IV. I conclude there was no consideration moving to the Rice Farmer for the promise to include the benefit payments in the 'gross proceeds' of the rice, one-half (or one-fourth as the case might be) to go to the Water Company. The water contract, taken as a whole, was for the cultivation by the Rice Farmer of land to rice, and the inclusion of the benefit payment in said definition was a gratuity, and not supported by a consideration.

"V. I conclude that the attempted inclusion of the benefit payments in the term 'gross proceeds' in the water contracts with the Rice Farmers is discriminatory against the Rice Farmers, who complied with the Agricultural Adjustment Act, because the Water Company furnished to other farmers who, to its knowledge, had not complied with the Act and were, therefore, not eligible to receive benefit payments, land, seed, and water, for one-fourth or one-half of the proceeds from the sale of the rice received."

This court finds fault with none of these quoted determinations of either kind; on the contrary, it finds that the evidence supports those of fact, and the authorities those of law.

The gist of appellant's whole attack upon them is packed into its several spear-heads, to the effect, respectively, (1) that the disputed clause neither provided for, attained, nor contemplated, any prescribed assignment or pledge of the benefits to be received by the Rice Farmers under the provisions of the Agricultural Adjustment Act, 7 U.S.C.A. c. 26, §§ 601, 602, and 608 especially, and of the various Administrative rulings pursuant thereto, but that its obvious purpose was this: "To furnish a yardstick to measure the amount of dol-

lars and cents, which the Rice Farmers were obligated to pay the Water Company for the water, and other things furnished them by the Water Company."

(2) Neither such Federal Act, nor the Administrative rulings thereunder, had any effect upon the ascertainment of how much the Rice Farmer owed the Water Company, since their sole objective, purpose, and effect was "to protect the Government from having to deal with anyone other than the persons with whom it made its contracts."

For authority it originally cites, in the main, such cases as Martin v. National Surety Company, 300 U.S. 588, 57 S.Ct. 531, 81 L.Ed. 822, and United Hay Co. v. Ford, 124 Tex. 213, 76 S.W.2d 480, to which are later added Minney v. Furman, Lawrence & Parker, Tex.Civ.App., 286 S. W. 287, and Rogers-Hill & Co. v. San Antonio Hotel Co., Tex.Com.App., 23 S. W.2d 329.

It is concluded that neither the quoted construction of the Federal policy involved, nor any of the relied upon holdings under it, rule the situation here presented.

■ To the contrary, it seems clear to this court, as it evidently did to the learned trial court, that at least the major purpose of the Adjustment Act was to extend aid to the farmers, as especially reflected in Section 601, supra, so that they might obtain a price for the commodities they produced that would, as near as might be, maintain a level between their productions and their necessary outlays, equivalent to the purchasing power agricultural commodities had had in prior years during the period from August of 1909 to August of 1914, and that the Adjustment Act itself so specifically declared.

■ To attain that objective, the machinery here involved was set up through authority conferred upon the Secretary of Agriculture and other agencies, which resulted in the rulings referred to that had direct application to the clause in these water contracts. When so regarded, it seems likewise plain that the Secretary of Agriculture and the other Administrative Agencies, whose acts are here brought under review in the rulings that have been cited upon both sides of this controversy, did not go further than, nor outside of, what must have so been the clear intent of Congress in thus adopting and declaring this policy of aid to the farmers.

■ Neither does the mere fact that these water contracts for 1935 were made on January 21 of that year, whereas the Department of Agriculture did not issue its Administrative rulings setting up the 1935 Southern Rice Production Program until April 18, of 1935, nor were the contracts between the parties here for that year made until July 13 of 1935, make any material difference in the resulting legal relationships under such contracts.

This for the reason that the parties upon both sides made their earlier contracts with their eyes open to, and their minds contemplating in advance, whatever competent regulations and rulings the Administrative Agency of the Government might thereafter make concerning these specified benefit payments; because, to the like knowledge of both sides, that Administrative Act itself was then and had for some prior time been in force and effect; wherefore, as the court below held, that Act was made a part of the water contracts between these litigants, as effectively as if its provisions had been expressly written into them.

■ This leads back to a consideration of whether or not the clause under review, in meaning or operative effect, ran counter to such declared policy of the Federal Government; there can likewise be, it is considered, but one answer to that inquiry—that it plainly did; indeed, the Adjustment Act itself recognized that the relief thereby contemplated for the farmers, that is, (1) to restore their purchasing power for necessary expenses, and (2) to raise the price of what they grew by restricting the volume of its production as a means to that end, created a national emergency. 7 U.S.C.A. Chapter 26, Sections 601, 602, 608.

In the face of that insistent policy, with the express provision in both the Act itself and the Administrative rulings under it, that the benefit payments so provided were for the sole use of the producer, and that there should be no sale, pledge, transfer, or assignment thereof, in whole or in part, to yet say that this Water Company could make a contract with these appellees by the express terms of which that policy of the Congress was at least set aside by the declaration of this disputed clause, that these benefits were not for the sole use and aid of these appellees, would be a strange doctrine.

In other words, its inclusion here would be nothing short of an effort to get from the Government indirectly what—by such express provisions to the contrary in the statute itself—could not be gotten directly. If these contracts expressed anything clearly, they did the distinctive agreement that compensation to the Water Company was based alone upon what it furnished the water, with or without the land added, for—the growing of rice thereon, and not preventing the growing of it; whereas, and necessarily within the contemplation of both parties hereto, what this Act of Congress sought to do, and that only, was to pay these appellee-farmers a bonus in the form of benefit payment for not planting any rice at all.

So that, the deduction appears to clearly follow that the Water Company in this instance—having furnished nothing whatever but the water with or without the added land, put up no part of the consideration for the reduction in acreage planted to rice, which was the sole basis upon which the appellee-farmers received all their benefit payments from the Government; to pay one for raising rice is certainly not synonymous with paying him for not raising it—especially when such payments for not planting were based alone in this instance upon the production history of the particular farmer and the particular land for previous years; evidently, then, this Water Company did not furnish, nor promise to furnish, nor contemplated at any time furnishing, anything under its contract with these farmers, which materially had to do with the payment of these benefits by the Government. It, therefore, did not occupy a dissimilar position to that of a money lender, who furnishes nothing to the borrower other than the money loaned, that is, no additional service nor thing of value, hence, in consequence, can get back nothing but the legally prescribed interest for the loan.

Wherefore, the trial court's characterization of this attempt to engraft upon the written contract such benefit payments as a gratuity, was correct.

Nor is it doubted, under such authority as United States v. Grimaud, 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563, even if that had been herein questioned, that the Congress had the power to give the authority to the Secretary of Agriculture to make the rules providing for the benefit payments here applied, under the Agricultural Adjustment Act.

As indicated, under this construction of that Act and of the disputed clause in these contracts, none of appellant's cited authorities rule this case; they are all, it is thought, distinguishable upon their determinative facts, as compared with those here; in the Martin case, supra, the court was construing R.S. § 3477, 31 U. S.C.A. § 203; here, as contradistinguished from the situation there, all of which is set out in the findings quoted supra, the selling, pledging, transferring, or assigning, in whole or in part, of these benefits was expressly inhibited by the Administrative rulings of the Government, by its contracts with the farmers, and in the face of this clause itself.

In the Ford case also, which this court passed upon and certified to the Supreme Court, a wholly different situation similarly existed, in that Ford himself and the United Hay Company were partners, and, as such, jointly owned the fund there involved, he being merely an agent to collect it for them both; whereas here, as appears above, the Water Company never at any time had or claimed any interest in these benefit payments, nor did it furnish a farthing of the consideration upon which the Federal Secretary was moved to bestow them upon these farmers.

These conclusions upon the admittedly controlling question presented by the appeal determine the merits of it, hence further discussion is deemed unnecessary; they require that an affirmance be had; it will be so ordered.

Affirmed.