

# THE ATTORNEY GENERAL
# OF TEXAS

JIM MATTOX
ATTORNEY GENERAL

September 25, 1989

Mr. Hilary B. Doran, Jr.
Chairman
Texas Racing Commission
P. O. Box 12080
Austin, Texas   78711

Opinion No. JM-1102

Re:  Whether the Texas Racing
Commission may adopt rules
regarding the regulating of
simulcasting  (RQ-1645)

Dear Mr. Doran:

Article 179e, V.T.C.S., the Texas Racing Act, created
the Texas Racing Commission [hereinafter the commission],
id. at § 2.01, and conferred on it broad rulemaking
authority governing horse racing and greyhound racing.[1] You
ask about the scope of that authority, specifically whether
the commission may promulgate rules regulating "simul-
casting" of race events.

You inform us that "simulcasting" is the transmission,
by electronic means, of a race track event that is conducted
at one racetrack and displayed at another location, in this
instance, another licensed racetrack.  Under such a system,

---

1.  Section 3.02 of the act confers broad authority
regarding regulation and supervision of races involving
wagering and provides:

> In accordance with section 3.01 of this
> Act, the commission shall regulate and super-
> vise every race meeting involving wagering on
> the result of greyhound or horse racing.  All
> persons and things relating to the operation
> of those meetings are subject to regulation
> and supervision. The commission shall adopt
> rules for conducting racing involving wager-
> ing and shall adopt other rules to administer
> this Act that are consistent with this Act.
> (Emphasis added.)

In addition, the act explicitly confers rulemaking authority
on the commission in over twenty specific instances.

pari-mutuel wagering is conducted at both locations, with the state's portion of the pari-mutuel pool at each location being taken and remitted to the state, as required by the act. You do not ask about any specific rules; rather, you ask about the commission's general authority.

You ask:

> Does the Texas Racing Act prohibit the Texas Racing Commission from adopting rules regarding the regulation of simulcasting?[2]

We conclude that article 179e, V.T.C.S., the Texas Racing Act, does not confer any authority on the Texas Racing Commission to promulgate rules regarding the regulation of simulcasting. We so conclude, because we construe the act to prohibit wagering on simulcast events.

Administrative agencies have only those powers that expressly are conferred by statute, Cobra Oil & Gas Corp. v. Sadler, 447 S.W.2d 887 (Tex. 1968), together with those necessarily implied from powers and duties expressly given or imposed. Stauffer v. City of San Antonio, 344 S.W.2d 158 (Tex. 1961). The threshold issue is whether the act permits wagering at licensed racetracks on simulcast events. If it does, then the commission has general authority to promulgate rules regulating such events. If the act does not permit wagering on such events, the commission has no such authority.

The act is detailed, expressly conferring comprehensive regulatory authority on the commission. If the legislature had intended that wagering on simulcast be permitted, one reasonably would expect the act to confer such regulatory authority expressly; yet the act does not confer express

---

2. You do not specify in your request whether you are concerned about the commission's authority regarding purely intrastate simulcasts or interstate simulcasts or situations in which an association is the host of a simulcast or an exhibitor of a simulcast. We note that section 3001 through 3007 of title 15 of the United States Code, the Interstate Horseracing Act of 1978 (P.L. 95-515), prohibits off-track pari-mutuel wagers being placed or accepted in one state with respect to the outcome of a horse race taking place in another state unless consent is obtained from (the host racing association), (the host racing commission,) and the off-track racing commission.

authority on the commission to regulate simulcasting. Indeed, nowhere in the act is "simulcasting" or any synonymous term or phrase even mentioned. You do not assert that the Texas Racing Act expressly permits wagering on simulcast events, but you do advance two arguments in support of the proposition that the legislature impliedly intended to permit such wagering. We find neither of your arguments persuasive.

First, you rely upon the language of sections 11.01 and 11.04 of the act. Section 11.01 confers explicit rulemaking authority on the commission regarding pari-mutuel wagering and provides in pertinent part:

> The commission shall adopt rules to regulate wagering on greyhound races and horse races under the system known as pari-mutuel wagering.[3] Wagering may be conducted only by an association within its enclosure. (Emphasis added.)

Section 11.04 of the act governs wagering and provides:

> (a) Only a person inside the enclosure where a race meeting is authorized may wager on the result of a race presented by the association by contributing money to the pari-mutuel pool operated by the association. The commission shall adopt rules to prohibit wagering by employees of the commission and to regulate wagering by persons licensed under this Act.

---

3. Subsection 1.03(18) of the act provides:

> 'Pari-mutuel wagering' means the form of wagering on the outcome of greyhound or horse racing in which those who wager purchase tickets of various denominations on an animal or animals and all wagers for each race are pooled and held by the racing association for distribution of the total amount, less the deductions authorized by this Act, to holders of tickets on the winning animals.

>        (b)   The   commission   shall   adopt   rules
> prohibiting  an  association  from  accepting
> wagers by telephone.
>
>        (c)   The   commission   shall   adopt   rules
> prohibiting an association  from accepting  a
> wager made on  credit and  shall adopt  rules
> prohibiting automatic banking machines within
> the enclosure.  (Emphasis added.)

But see V.T.C.S. art. 179e,  § 3.02 (commission shall  adopt rules for conducting racing involving wagering).

Your argument focuses on the use of the word "presented" in section 11.04(a),  contrasting that with  the use of  the word "conducted" in section 11.01.[4]  You assert:

> Some members of  the commission believe  this
> section  [section  11.01  of  the  act]  also
> authorizes  the  commission  to  adopt  rules
> regulating  wagering  on  simulcast  races,
> including  regulations  regarding  the  race-
> tracks from which  a simulcast is  broadcast,
> the racetracks at which  a simulcast will  be
> presented, and  the  type of  equipment  that
> will transmit the  simulcast electronic  sig-
> nals.
>
> Section 11.04(a)  offers  additional  support
> for this belief.  In that subsection,  wager-
> ing is restricted to races that are presented
> by an association.  Several places in the Act
> refer to an association that conducts  races.
> [Citations omitted.]  Under the 'plain  mean-
> ing' rule of statutory construction, we  must
> assume that the  use of  two different  terms
> indicates a  difference  in  meaning  is  in-
> tended.  [Citation omitted.]  Use of the word
> 'presented' indicates  that  the  legislature
> intended a  different meaning  from what  the

-------------------

   4.   When the bill reached the floor of the Senate,  the sentence of section  11.01 that is  underscored above  read: "Wagering may be conducted only by an association within its enclosure during a  race meeting."  The underscored  phrase was deleted by floor amendment and the phrase "presented  by the association" was  inserted after the  word race in  subsection 11.04(a).

> word 'conducted' would have conveyed. This section [subsection 11.04(a)] indicates that the legislature contemplated that races could be <u>presented</u> by an association for pari-mutuel wagering without being <u>conducted</u> by that particular association. Obviously, Section 11.04(a) permits only an association that is licensed to conduct race meetings at some time to present, for wagering purposes, races that are conducted elsewhere.
>
> Although the Act does not explicitly mention simulcasting, the plain language of the statute indicates that simulcasting is authorized by the Act and that the Commission is authorized to adopt rules to regulate simulcasting. (Emphasis in original.)

It is generally presumed that every word in a statute is used for a purpose. <u>Cameron v. Terrell & Garrett, Inc.</u>, 618 S.W.2d 535 (Tex. 1981). But, in construing a statute, we must look to the intent of the legislature and must construe the statute as a whole so as to give effect to that intent. <u>Knight v. International Harvester Credit Corp.</u>, 627 S.W.2d 382 (Tex. 1982).

> The fundamental rule controlling the construction of a statute is to ascertain, if possible, the intention of the Legislature as expressed in the language of that statute. [Citation omitted.] <u>In ascertaining this intent, courts must examine the entire statute or act and not merely an isolated portion thereof.</u> [Citation omitted.] Further, if the intent of the Legislature is ascertained, courts must enforce that intent even though the intent is not altogether consistent with the strict letter of the statute. [Citation omitted.] (Emphasis added.)

<u>State v. Terrell</u>, 588 S.W.2d 784, 786 (Tex. 1979).

The word "present" is defined by Webster's New World Dictionary of the American Language to mean, <u>inter alia</u>, "to offer for viewing or notice; exhibit; display; show." The same dictionary defines "conduct" to mean, <u>inter alia</u>, "to manage, control, or direct." While there is a dictionary distinction between the meanings of the two words, there is no meaningful distinction between the two words when the act is read as a whole. Your argument is not persuasive, because, throughout the act, the words "present," "hold,"

"conduct," and "run" are used interchangeably. See, e.g., §§ 9.03 ("An association shall provide for the _running_ of races . . ."); 9.05 ("When a horse racing association _runs_ both quarter horse and Thoroughbred races . . ."); 9.06 ("If a horse racing association _conducts_ quarter horse and Thoroughbred racing . . ."); 10.02 ("If . . . it is impossible for the licensee to _hold_ or _conduct_ a race . . ."); 11.01 ("Wagering may be _conducted_ . . ."); 11.04 ("Only a person inside the enclosure where a race meeting is authorized may wager on the result of a race _presented_ by the association. . . ."). (Emphasis added.)

Section 3.02 of the act requires the commission to "regulate and supervise every _race meeting_ involving wagering on the result of greyhound or horse racing." (Emphasis added.)[5] Subsection 1.03(6) of the act provides:

> 'Horse race meeting' means the _conducting_ of horse races on a day or during a period of consecutive or nonconsecutive days. (Emphasis added.)

Subsection 1.03(50) of the act provides in pertinent part:

> 'Greyhound racing days' means days on which a permitted association _conducts_ greyhound racing. (Emphasis added.)

Subsection 1.03(2) of the act provides:

> 'Association' means a person licensed under this Act to _conduct_ a horse race

---

5.  We note that article 179e-4, V.T.C.S., provides:

> Any provision in this Act to the contrary notwithstanding, the Texas Racing Commission shall regulate all aspects of greyhound racing and horse racing in this state, whether or not that racing involves pari-mutuel wagering.

We understand you to ask about the simulcasting of race events conducted by associations engaged in pari-mutuel wagering. Therefore we do not address the scope or nature of the authority conferred by article 179e-4, V.T.C.S. See Attorney General Opinion JM-971 (1988).

> meeting or a greyhound race meeting with
> pari-mutuel racing. (Emphasis added.)

Section 6.14 of the act provides that an "association may not _conduct_ greyhound or horse racing" at any place other than the place designated in its license, except as provided in the act. Section 6.15 of the act permits, under certain circumstances, an "association to _conduct_ races" at a temporary location.

Thus, even if we assumed _arguendo_ that there were a meaningful distinction in the act between the words "conduct" and "present," we construe the act to permit associations to _present_ only those race meetings involving pari-mutuel wagering that are themselves _conducted_ by that association, _i.e._ those race meetings that an association itself manages, controls, or directs. Our construction of the act is strengthened by the fact that sections 6.08 and 6.09 of the act fail to address the allocation of shares and breakage and the disposition of pari-mutuel pools in an instance in which a simulcast event is presented. It would be anomalous for the legislature to intend that associations be permitted to engage in wagering on simulcast events without, at the same time, providing a means whereby the pari-mutuel pools created by such wagering be allocated.[6]

Second, you rely on the legislative history of the act to support your construction. You place significance on the fact that the senate rejected a floor amendment to the act that expressly would have prohibited wagering on simulcast events. The amendment would have added section 11.10 to the act, which provided as follows:

> Sec. 11.10. SIMULCAST PROHIBITION. The Commission shall adopt rules forbidding the simulcasting of any race taking place in this state to any other track in this state or any other state. _The Commission shall also adopt rules prohibiting pari-mutuel wagering on_

---

6. Our construction of the act is in accord with those state authorities that have addressed the same issue, construing language that is substantively identical with that in the Texas act. _See_ _Advanced Delivery Serv., Inc. v. Gates_, 228 Cal Rptr. 557 (Cal. Ct. App. 1986); _Atlantic City Racing Ass'n v. Attorney General_, 489 A.2d 165 (1985); 66 Op. Cal. Att'y Gen. 225, 66 Op. Cal. Att'y Gen. 94 (1983); Op. Ky. Att'y Gen. No. 82-4 (1982).

> greyhound or horse races which are broad-
> cast to or from locations where pari-mutuel
> wagering occurs.[7]  (Emphasis added.)

Although Texas courts have held that the deletion of a provision in a pending bill discloses a legislative intent to reject the proposal, Smith v. Baldwin, 611 S.W.2d 611 (Tex. 1980); Transportation Ins. Co. v. Maksyn, 580 S.W.2d 334 (Tex. 1979); Grasso v. Cannon Ball Motor Freight Lines, 81 S.W.2d 482 (Tex. 1935), that is not a rule that is uniformly followed in every case:

> The rejection of a proposed amendment to a statute may constitute some argument for legislative interpretation of the act amended or sought to be amended. To such extent it can be considered by the courts in interpreting the act. However, the rejection of an amendment as such does not control the construction of the statute. 82 C.J.S. Statutes § 360.

> There are decisions holding that in construing a statute, rejected amendments, or rejected alternative legislation, should not be considered, or at least should be given little weight, since the courts can have no means of knowing the real reasons that influenced the legislature in such rejection. In any event, the rejection of an amendment, or the elimination of words from a bill before its passage, is not conclusive of the bill's inapplicability to the matters included in such amendment or described by such words. See 73 Am. Jur.2d Statutes § 172.

City of Ingleside v. Johnson, 537 S.W.2d 145, 153 (Tex. Civ. App. - Corpus Christi 1976, no writ).

---

7. We note that the underscored language of the tabled amendment, on its face, would have authorized the commission to regulate, not just the simulcasts of races conducted in other states, but the actual races themselves. It reasonable to assume that the senate tabled the amendment in the belief that such a provision would violate both the Interstate Horseracing Act of 1978 and the interstate commerce clause of the United States Constitution.

The Texas cases that have addressed whether the deletion of a provision in a pending bill discloses legislative intent are easily distinguishable from the instant fact situation.  Those cases involved the deletion, either in conference committee or during the floor debate in one house, of provisions that were set forth in the original bills, as introduced.  Here the amendment offered would have constituted an addition to the original bill, not a deletion of one of its original provisions.  None of the cases cited above involved the tabling of a floor amendment in one house of a provision that was not contained in an original bill.

Under your argument, the fact that the senate rejected the floor amendment would authorize not only the commission to promulgate rules regulating simulcasting, but it would also authorize the commission to promulgate rules regulating off-track wagering.  Surely the legislature did not intend that such an important public policy matter as the authorization of simulcasting or of off-track wagering be left to the discretion of the commission, especially when no other provision of the act supports such a construction.  In this instance, it is reasonable to assume that the senate tabled the floor amendment for the reason that it would be useless for the legislature to forbid something not authorized by the act in the first place.

We need not determine, however, the significance, if any, of the senate's tabling of the floor amendment to the act that expressly would have prohibited wagering on simulcast events.  While the Code Construction Act, which governs the construction of each code enacted by the 60th or any subsequent legislature, appears to permit consideration of legislative history regardless of whether a code provision is thought to be ambiguous,[8] that act does not control the construction of civil statutes.  Where there is no ambiguity and the intent of the legislature is apparent from the

_____

8.  Chapter 311 of the Government Code, the Code Construction Act, contains section 311.023, which provides in pertinent part:

> In construing a statute, <u>whether or not the statute is considered ambiguous on its face</u>, a court may consider among other matters the:
>
> (3) legislative history. (Emphasis added.)

words of the statute, it is not necessary to analyze extrinsic evidence of legislative intent. <u>Minton v. Frank</u>, 545 S.W.2d 442 (Tex. 1976). The Texas Racing Act is not ambiguous on this issue and its intent is clear. In any event, the rejection of such an amendment is not tantamount to an affirmative grant of authority, permitting either the simulcasting of race meetings or off-track wagering.

An agency may not exercise authority that exceeds the clear intent of the legislature, <u>Gulf Coast Water Co. v. Cartwright</u>, 160 S.W.2d 269 (Tex. Civ. App. - Galveston 1942, writ ref'd w.o.m.), nor may it enlarge its powers by its own orders. <u>Railroad Comm'n v. Fort Worth & D. C. Ry. Co.</u>, 161 S.W.2d 560 (Tex. Civ. App. - Austin 1942, writ ref'd w.o.m.). Accordingly, we conclude that article 179e, V.T.C.S., the Texas Racing Act, confers no authority on the Texas Racing Commission to promulgate rules regulating the simulcasting of race events, because the act itself does not permit wagering on such events.

<u>S U M M A R Y</u>

Because article 179e, V.T.C.S., the Texas Racing Act, does not itself authorize an association to engage in pari-mutuel wagering on simulcast events, the Texas Racing Commission is without authority to promulgate rules regulating simulcast events.

Very truly yours,

JIM MATTOX
Attorney General of Texas

MARY KELLER
First Assistant Attorney General

LOU MCCREARY
Executive Assistant Attorney General

JUDGE ZOLLIE STEAKLEY
Special Assistant Attorney General

RICK GILPIN
Chairman, Opinion Committee

Prepared by Jim Moellinger
Assistant Attorney General