**In the Matter of TOPGALLANT LINES, INC. (Chapter 11 Case 89–41996), Debtor.**

**AMBASSADOR FACTORS, DIVISION FLEET FACTORS CORPORATION, Plaintiff,**

v.

**FIRST AMERICAN BULK CARRIER CORPORATION, et al., Defendants.**

**Adv. P. No. 90–4072.**

United States Bankruptcy Court, S.D. Georgia, Savannah Division.

Feb. 4, 1991.

John M. Tatum, Miller, Simpson & Tatum, Savannah, Ga., Joseph Moscou, Mineola, N.Y., for plaintiff-movant.

Thomas A. Dillon, Jr., New York City, Stephen R. Beckham (co-counsel), Chattanooga, Tenn., Kathleen Horne, Savannah, Ga., for First American Bulk Carrier.

## MEMORANDUM AND ORDER ON MOTION FOR SUMMARY JUDGMENT

### LAMAR W. DAVIS, JR., Chief Judge.

On December 10, 1990, a hearing was held upon cross motions for summary judgment arising from a Complaint to Determine Validity, Extent and Priority of Liens related to the above-styled case pending before this Court under Chapter 11 of the Bankruptcy Code. Upon consideration of the evidence, the voluminous briefs and other documentation submitted by the parties as well as applicable authorities, I make the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

The Debtor, Topgallant Lines, Inc., was the sub-charterer of two vessels, the M/V Chesapeake Bay and the M/V Delaware Bay. Its predecessor in interest sub-chartered the vessels from the disponent[1] owner, First American Bulk Carriers ("FABC") on or about April 21, 1987, in accordance with two sub-bareboat charter parties. By separate addenda dated June 30, 1989, the foregoing charter parties were amended and assigned by Topgallant Group, Inc., to the Debtor, Topgallant Lines, Inc. [Exhibits "A" and "B" to Plaintiff's Statement of Uncontradicted Material Facts, filed September 14, 1990 (hereinafter "P's Sept. Stmt. Facts")]

On April 19, 1989, the Debtor and the Plaintiff, Ambassador Factors, Division of Fleet Factors Corporation ("Ambassador"), entered into a Security Agreement covering accounts receivable, inventory, and equipment of the Debtor. (Exhibit "C", P's Sept. Stmt. Facts). There has been no stipulation as to the validity of that agreement. On April 28, 1989, Ambassador recorded two Uniform Commercial Code Financing Statements in the Office of the Clerk of the Superior Court of Chatham County, Georgia, covering "[a]ll present and hereafter created and/or acquired accounts receivable, inventory, machinery and equipment and general intangibles [of the debtor] ..." (Exhibit "D", P's Sept. Stmt. Facts).

There is some dispute whether FABC affirmatively terminated the charters on or before December 13, 1989, or whether FABC and the Debtor had mutually agreed to operate under the terms of the charters after that date. In any event, the Debtor filed its voluntary petition under Chapter 11 of the Bankruptcy Code with this Court on that date. At the time, the M/V Chesapeake Bay had been arrested in Bremerhaven, West Germany, by certain parties asserting maritime liens and the M/V Delaware Bay had set sail for Europe from Charleston, South Carolina. Upon arrival at Bremerhaven, the M/V Delaware Bay was also arrested under German law by parties asserting maritime liens. [See Exhibit "1", Plaintiff's Second Supplement to Statement of Uncontested Material Facts]

Pursuant to Order of this Court dated December 29, 1989, as amended by subsequent Orders, a fund of money is being held in an interest bearing segregated account (the "Fund"). The Fund includes all collections on the Debtor's accounts, all

---

1. A "disponent" shipowner does not own the vessel but leases or otherwise obtains it for the necessary shipping period.

freight[2] monies for cargoes carried by the vessels, and all other monies received by the Debtor or by Ambassador for the Debtor's account. By Order of this Court, all Funds are deemed to retain the character they held prior to deposit to the Fund and thus any freight monies deposited in the Fund following that Order maintain their character as freights for maritime lien purposes. It is disputed whether all the freights of the final voyage were earned by the Debtor, but it is not disputed that some of the money in the Fund does constitute freights earned by the Debtor (Par. 7., P's Sept. Stmt. Facts) to which the Ambassador security interest and the maritime liens of various creditors attach.

FABC and other creditors have filed proofs of claim totalling in the millions of dollars, asserting that their claims are, in whole or in part, secured by maritime liens on the Debtor's freights, including those deposited in the Fund and others which have not yet been collected. The validity and amount of individual lien claims are not at issue now and are not within the scope of this Order.

Topgallant Lines' accounts included freights and other monies due from the Military Sealift Command ("MSC") pursuant to a government contract. Ambassador did not comply with the execution formalities, the notice, or other requirements prescribed by the Federal Assignment of Claims Act, 31 U.S.C. Section 3727(b), insofar as assignment of its interest in the MSC monies is concerned. The MSC claims had not been allowed, their amounts had not been determined and warrants for their payment had not been issued prior to December 13, 1989, the date of Debtor's filing. However, on April 30, 1990, the MSC paid $708,326.00 into the sequestered Fund (Par. 6, P's Sept. Stmt. Facts) and a claim for more than that amount is still outstanding.

It has not yet been established but is alleged that the Debtor's outstanding debt to Ambassador as of the date of filing was $4,021,476.55.[3]

Ambassador moves for summary judgment on five separate grounds. First, for a ruling that Ambassador has a valid perfected security interest in freights of the two vessels as against the Debtor-in-Possession and other creditors. Second, that FABC has no lien or other claim to freight of the two vessels. Third, that monies paid to the Debtor or its agent are not subject to maritime liens. Fourth, that maritime lien claims of creditors are limited to freights earned on the specific voyage for which each such creditor furnished supplies or rendered services. Finally, for a ruling that Ambassador's security interest in the Debtor's accounts, including freights, has priority over all conflicting liens.

FABC moves for partial summary judgment on two grounds. First, for an Order declaring that maritime liens on freights have priority over consensual non-maritime security interests therein. Second, that collateral assignments of claims against the United States Government are unenforceable in the absence of compliance with the Federal Assignment of Claims Act. Pursuant to Fed.R.Civ.P. 56(d),[4] I will

---

**2.** "Freight" earned by cargo represents, exclusive of commissions, the sum to be paid for use of a ship, and a lien on cargo when the vessel has not been paid its hire is a lien on the sum earned by the cargo. *N.H. Shipping Corp. v. Freights of the S.S. Jackie Hause,* 181 F.Supp. 165 (S.D.N.Y.1960).

**3.** Although this amount was cited as "uncontested" in paragraph 8 of the Plaintiff's September 14, 1990, Statement of Uncontested Material Facts, I note that in paragraph 4 of the Answer of First American Bulk Carriers to the Complaint and Counterclaim, dated May 5, 1990, FABC stated it "is without knowledge or information sufficient to form a belief as to the truth of the allegations ... and, on that basis, denies said allegations as the amount of the outstanding debt."

**4.** Rule 56(d) provides: *Case Not Fully Adjudicated on Motion.* If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the

grant partial summary judgment to FABC on the maritime lien versus UCC security interest priority issue and deny summary judgment to FABC on the Assignment of Claims Act issue. This ruling will have the effect of granting Ambassador partial summary judgment on its first and fifth enumerated issues as will be further clarified in this Opinion. Ambassador's Summary Judgment Motion on the other enumerated grounds will be treated as continued, until the record is supplemented by all parties as directed at the hearing in this matter.

## CONCLUSIONS OF LAW

■ The first issue before the Court is whether a perfected security interest pursuant to the Uniform Commercial Code is superior to the interest of a maritime lien claimant with respect to maritime freights earned by the Debtor. I find that a valid maritime lien is superior to a perfected non-maritime UCC security interest in the same collateral.

■ The Federal Maritime Lien Act, 46 U.S.C. Section 31342, provides "a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner has a maritime lien on the vessel." This section recodified the former provision of 46 U.S.C. Section 971 which provided "any person furnishing repairs, supplies, use of drydock or marine railways, or other necessaries, to any vessel ... upon the order of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel." The Federal Maritime Lien Act has been construed by a number of courts in such a way that the term "vessel" includes freights since the general rule is that if a maritime lien attaches to a vessel it also attaches to its freights which are incident to the vessel. *Schirmer Stevedoring Co. v. Seaboard Stevedoring Corp.*, 306 F.2d 188 (9th Cir. 1962). *See also, In re Surico*, 42 F.2d 935 (D.Wash.1930); *Atlantic, Gulf and Pacific S.S. Co.*, 3 F.2d 311 (D.Md.1923), *aff'd* 3 F.2d 438 (4th Cir.1925). Similarly, the UCC

as adopted in Georgia and indeed in 49 of 50 states applies "to any transaction which is intended to create a security interest ... in general intangibles ... or accounts." O.C.G.A. § 11-9-102. Accounts and general intangibles are defined in Section 9-106 as including "any right to payment for goods sold or leased or for services rendered ... as well as all rights to payment earned or unearned under a charter or other contract involving the use or hire of a vessel ..." The Maritime Lien Act supercedes, by its terms "any state statute conferring a lien on a vessel to the extent the statute establishes a claim to be enforced by a civil action *in rem* against vessels for necessaries." 46 U.S.C. § 31307. I find no provision in the Uniform Commercial Code which provides for a civil action *in rem* against a vessel or its freights. To the extent that O.C.G.A. Section 11-9-501 *et seq.* provides that after default a party may proceed under the terms of its security agreement and to the extent that the security agreement provides for self-help repossession, attachment or other remedies against the collateral, it could be argued that the UCC permits contractual remedies *in rem* on behalf of the secured lender. However, there is no specific provision creating an *in rem* action against the vessel or its freights for necessaries as contemplated in the Federal Maritime Lien Statute. Therefore, the Maritime Lien Statute does not by its terms explicitly supercede the Georgia Uniform Commercial Code.

Accordingly, I find that the freights, that is the revenues received from shipping cargo, are subject to both the state Uniform Commercial Code as well as the Federal Maritime Lien Statute. *See Matter of Pacific Caribbean Shipping (U.S.A.), Inc.*, 789 F.2d 1406, 1407 (9th Cir.1986) (holding that subfreights are included within the literal terms of UCC 9-106 "both because they are a right to payment for services rendered, and because they are a right incident to a vessel charter").

---

amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just. Upon the trial of

the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.

The more critical determination is what priority among themselves do the maritime and UCC interests have in the same collateral? O.C.G.A. Section 11–9–104 states that the UCC does not apply to a security interest subject to any statute of the United States to the extent that such statute governs the rights of parties to and third parties affected by transactions in particular types of property. I construe the language of 9–104(a) to be a specific recognition that nothing in the UCC is intended to apply to any security interest in freights, such as that held by Ambassador Factors, but only to the extent that the freights are also subject to any statute of the United States which specifically governs lien rights of parties against those same freights. *See Midlantic Nat'l Bank v. Sheldon,* 751 F.Supp. 26 (E.D.N.Y.1990) (Construing Section 9–104 of the New York UCC to mean that the District Courts' admiralty jurisdiction and the provisions of 46 U.S.C. Section 31301 *et seq.* preempt New York lien law).

The official text of the pre–1972 Uniform Commercial Code included the words "such as the Ship Mortgage Act, 1920," as an example of statutes of the United States that were not affected by passage of the Uniform Commercial Code. That phrase was stricken in the 1972 official text and the 1972 language is not altered in the Georgia version of the Uniform Commercial Code. I, therefore, conclude that the Georgia General Assembly considered not only the Ship Mortgage Act, but also the Maritime Lien Statute, and perhaps other federal statutes which govern rights of parties in particular types of property transactions to be unaffected by the passage of the Uniform Commercial Code. To be more specific, in determining priority as between the UCC security interest of Ambassador Factors and non-consensual maritime lien claims, the priority provisions of the Uniform Commercial Code have no effect on the maritime lien rights created in 46 U.S.C. Section 31342 and its predecessor. *See Pacific Caribbean, supra* at 1408 [Article 9 of the UCC should not be interpreted to apply to maritime liens and does not conflict with federal law, even though a

maritime lien arguably falls within the definition of a security interest found in U.C.C. Section 1–201(37) ]; *In re Sterling Navigation Co., Ltd.,* 31 B.R. 619 (S.D.N.Y.1983) (A shipowner's maritime lien on subfreight was not subject to Article 9 of the New York Commercial Code and thus had priority over a bankruptcy trustee without the need to comply with the filing requirements of the New York UCC); *Matthews v. Richmond,* 11 Wash.App. 703, 525 P.2d 810 (1974) (The vendor's perfection of a security interest under Article 9 of the UCC does not establish priority over a supplier's maritime lien).

Alternatively, 9–102(1)(a) provides in part "this article applies in any transaction (regardless of its form) which is *intended to* create a security interest in personal property...." (emphasis added). Clearly Article 9 of the Uniform Commercial Code defines only the rights and liabilities of parties to consensual transactions creating security interests in personal property. The transaction between Ambassador Factors and the Debtor is such a transaction. However, the claim of maritime lien holders, by definition, is not consensual. Therefore, the priority provisions of O.C.G.A. Section 11–9–301, *et seq.* are inapplicable in determining the priority of maritime liens vis-a-vis UCC security interests. This conclusion is further buttressed by the language of 11–9–102(2) which states in part "this article does not apply to statutory liens" (with exceptions not relevant here). Clearly maritime liens are federal statutory liens and thus are not governed by the priority or other provisions of the Georgia UCC.

Having established that the Uniform Commercial Code does not purport to superimpose its priority provisions upon those established under federal maritime law, I also observe that O.C.G.A. Section 11–1–103 makes clear that, unless displaced by the particular provisions of the UCC, existing principles of law and equity shall supplement the provisions of the UCC. Accordingly, I conclude that decisions of numerous courts interpreting the relative priorities of holders of maritime lien interests

as opposed to those holding consensual assignments of interests of freights constitute controlling authority whether they were decided pre or post UCC.

Under those decisions, it is well-settled that the holder of a valid maritime lien enjoys a priority position superior to the holder of a consensual assignment for collateral purposes of an interest in freights. *Freights of the Kate*, 63 F. 707 (S.D.N.Y. 1894) (An owner or charterer which pledged all freights earned and to be earned with respect to future voyages was deemed to have created a maritime contract granting a general lien which could be enforced in admiralty against the freights of the vessels. However, the general consensual lien was subordinate to any specific lien on the same freights for advances by third parties actually applied to assist the current voyage.) *See also Pacific Caribbean, supra* (Shipowner's charter lien upon subfreights prevailed over the claim of the bankruptcy trustee although the maritime lien was not filed of record as provided for by the Uniform Commercial Code); *Taiwan Int'l Line, Ltd., v. Matthew Ship Chartering, Ltd.*, 546 F.Supp. 826 (S.D.N.Y.1982) (Where a vessel is free to assign only surplus freights earned after full payment of the vessel's hire the bank's general assignment is effective to reach freights at issue but will not prevail over a valid maritime lien on the same funds. Maritime liens prevail over all non-maritime claims and over all maritime claimants whose liens arise earlier in time); *Matthews v. Richmond, supra* (Vendor's perfection of a security interest under Article 9 does not establish priority over a maritime lien of the supplier in the same freights although the holder of a maritime lien may consent to subordination of its claim to the Article 9 interest or may be estopped from asserting priority status.); *Atlantic, Gulf & Pac. S.S. Co., supra* (Stevedore's maritime lien on freights is superior to assignments taken by Commercial Credit Company, as se-

curity for money advanced to the bankrupt purchaser); *United States v. Sterling*, 22 F.2d 323, 325 (S.D.N.Y.1927) (Maritime lien claims of registered owner for sums advanced to pay maritime liens of suppliers of necessaries superior to rights of lender, who took assignment of freights from purchaser in possession).

Based on the foregoing analysis and contrary to the assertion of the Plaintiff, there is simply no conflict between the UCC and existing maritime law. Nor does the intervention of bankruptcy create such a conflict. *Morgan Guar. Trust Co., v. Hellenic Lines, Ltd.*, 38 B.R. 987 (S.D.N.Y.1984) ("the trustee in bankruptcy takes the schooner in the same plight and condition as she was held by the bankrupt, i.e., subject to all valid maritime liens to be enforced with priorities according to the admiralty law"); thus, the argument propounded by Plaintiff that the UCC is "an appropriate source of federal commercial law" is not rejected, it simply falls short of compelling a result that would supplant pre-existing federal maritime concepts. Likewise, the issue of whether Congress intended to preempt state law in its adoption of the Maritime Lien Statute is not reached because the Uniform Commercial Code clearly does not contemplate that its reach would be broad enough to interfere with non-consensual maritime liens.

For the foregoing reasons, I grant partial summary judgment in favor of FABC and find for all purposes in this case that valid maritime liens as hereafter allowed will be afforded priority over perfected UCC security interests which in turn will have priority over general unsecured claims. As to unsecured, non-maritime claims, see O.C.G.A. Section 11–9–301.

The second issue before the Court concerns the effect of non-compliance with the Federal Assignment of Claims Act (hereinafter the "Claims Act"), 31 U.S.C. Section 3727.[5] FABC asserts that the UCC securi-

---

**5.** The Assignment of Claims Act reads in relevant part:

§ 3727(b) An assignment may be made only after a claim is allowed, the amount of the claim is decided, and a warrant for payment

of the claim has been issued. The assignment shall specify the warrant, must be made freely, and must be attested to by 2 witnesses. The person making the assignment shall acknowledge it before an official who may ac-

ty held by Ambassador has been voided as a result of Ambassador's failure to comply with the provisions of the Claims Act and moves for summary judgment on that issue. I deny that motion.

■ After consideration of applicable authorities, I conclude that the Assignment of Claims Act is intended for the protection of the government and was initially codified as an effort to prevent the assertion of multiple or fraudulent claims against the government. Accordingly, the statute is inapplicable in the case at bar where the government does not assert that statute as a defense, and where in fact substantial sums of money have been paid by the government to Debtor subsequent to the filing of the case.

The primary case relied upon by FABC, *National Bank of Commerce v. Downie*, 218 U.S. 345, 31 S.Ct. 89, 54 L.Ed. 1065 (1910), is wholly inapplicable. FABC noted in its initial brief filed May 29, 1990, that the Supreme Court in *Downie* ruled that assignments not made in accordance with the Act are "absolutely null and void." (Brief p. 27). FABC went on to state at page 28 that "this case is indistinguishable from *Downie*." FABC cites *Martin v. National Surety Co.*, 300 U.S. 588, 57 S.Ct. 531, 81 L.Ed. 822 (1937), as expanding the *Downie* decision. I disagree and note that *Martin* has been consistently interpreted as limiting *Downie*.

As noted in *In re Ideal Mercantile Corp.*, 244 F.2d 828 (2nd Cir.1957), *cert. denied*, 355 U.S. 856, 78 S.Ct. 84, 2 L.Ed.2d 63 (1957):

In *Downie*, the Supreme Court held that the assignment of unpaid and unallowed claims against the United States was void as against the subsequent trustee in bankruptcy of the assignor. The Court did not rest its decision on the ground that the claims had not been paid or even allowed at the time of the filing of the petition in bankruptcy, but held the purported assignment to be 'absolutely null and void, and as not, in itself,

passing to the appellants (creditor-assignees) any interest, present or remote, legal or equitable, in the claims transferred'.

Subsequently, however, in the case of *Martin v. National Surety Co.*, the Supreme Court held that a conditional assignment by a contractor to his surety of payments due on a government contract, although not made in compliance with the Assignment of Claims Act was enforceable against one who, with notice of the prior assignment, had loaned money to the contractor-assignor and, under power of attorney from the contractor, had collected the deferred payments from the Government and applied them to his loan. Pointing out that the Assignment of Claims Act was enacted for the protection of the Government, Mr. Justice Cardozo, speaking for the Court, stated that 'the Government is not concerned to regulate the equities of claimants growing out of irregular assignments when collection is complete and liability is ended.... A transfer of the fund after payment is perfected is of no concern to anyone except the parties to the transaction, and this quite irrespective of the time of the assignment or the manner of its making'.

Thus, without overruling the *Downie* decision, the Supreme Court in *Martin v. National Surety Co.*, limited the prior decision to assignments of unpaid claims against the government, declaring that 'after payments have been collected and are in the hands of the contractor or subsequent payees with notice, assignments (previously made) may be heeded, at all events in equity, if they will not frustrate the order to which the prohibition was directed'.

The *Martin* case has been subsequently cited by the Supreme Court, and it seems clear that an assignment of a claim against the United States is enforceable in many cases as between the parties to that assignment, or their suc-

knowledge a deed, and the official shall certify the assignment. The certificate shall state that the official completely explained the as-

signment when it was acknowledged. An assignment under this subsection is valid for any purpose.

cessors in interest, after the Government has paid the claim.

*Id.* at 831–32 (citations omitted); *See also Kolb v. Berlin,* 356 F.2d 269, 270 (5th Cir. 1966). It is clear, therefore, that *Martin* did not expand the *Downie* decision, as asserted by FABC.

The Supreme Court again addressed this issue in *McKenzie v. Irving Trust Co.,* 323 U.S. 365, 65 S.Ct. 405, 89 L.Ed. 305 (1945), and dismissed a complaint brought by a trustee in bankruptcy to recover money paid by the debtor to its creditor pursuant to an assignment which had not complied with the Act. The Court again noted that the Act is for the protection of the government and not the regulation of the equities of the claimants as between themselves. 323 U.S. at 369, 65 S.Ct. at 407. The Court deemed non-compliance with the Act irrelevant as the payment had already been paid over by the government. *Id.*

Even when the monies have not been paid by the government courts have upheld non-complying assignments so long as there is no possibility that the government might become embroiled in conflicting claims. *See Segal v. Rochelle,* 382 U.S. 375, 86 S.Ct. 511, 15 L.Ed.2d 428 (1966) (Debtor's right to tax refunds, as yet unpaid, were transferable prior to bankruptcy regardless of compliance with the Claims Act); *In re Lagerstrom,* 300 F.Supp. 538 (S.D.Ill.1969) (Assignment of yet unpaid tax refund valid between debtor and attorney as against bankruptcy trustee notwithstanding non-compliance with the Claims Act).

Indeed, as early as 1918, the Supreme Court held that the Assignment of Claims Act will not apply to disputes in which the United States is no longer an interested party and in which the controversy was between private parties. *Lay v. Lay,* 248 U.S. 24, 39 S.Ct. 13, 63 L.Ed. 103 (1918). In this Circuit there is binding authority on that point as well. *See Mayo v. Pioneer Bank & Trust Co.,* 270 F.2d 823 (5th Cir. 1959),[6] *cert. denied* 362 U.S. 962, 80 S.Ct.

878, 4 L.Ed.2d 877 (1960) [When the government has paid or honored a claim, *or no longer has any vital interest,* the assignment is good between the parties or their successors in interest in spite of the fact that the government was not given notice of the assignment and therefore bankruptcy trustee could not avoid the transaction and recover alleged preference (emphasis added)]; *King v. Gilbert,* 569 F.2d 398 (5th Cir.1978) (Rejecting the assertion of trustee in a corporate reorganization that the anti-assignment statute rendered the assignment of a tax refund invalid and noting the Supreme Court's view that as between private parties, effect may still be given to an assignment which was not in compliance with the Claims Act). *See also Danning v. Mintz,* 367 F.2d 304 (9th Cir.1966), *cert. denied* 386 U.S. 990, 87 S.Ct. 1305, 18 L.Ed.2d 335 (1967) (Where the government was not exposed to the threat of multiple claims as the claim had already been paid and the government's liability was at an end, the statute was inapplicable as it was for the protection of the government and not for the regulation of an assignment between private parties); *In re Lagerstrom, supra.* (Where debtor assigned his income tax refund to his bankruptcy attorney for legal services and bankruptcy trustee sought a declaration that the assignment was invalid for noncompliance with the Claims Act, the Court held that the Claims Act was intended for protection of the government and assignment not in compliance with the Act, although not valid against the government, was valid between the private parties); *Matter of Palmetto Pump & Irrigation, Inc.,* 81 B.R. 109, 112 (Bankr.M.D.Fla.1987) (There is no question that the Claims Act was designed to protect the government and hence has no bearing upon the contractual rights of non-governmental entities in the absence of governmental intervention); *In re Metric Metals Int'l Inc.,* 20 B.R. 633, 636 (S.D.N.Y.1981) (Claims Act will not invalidate assignment between non-governmental entities where there is no sugges-

---

**6.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

690

tion that the government might become embroiled in conflicting claims to funds); *In re Altek Systems, Inc.*, 14 B.R. 144, 149 (Bankr.N.D.Ill.1981) (Where the government is not a party, is not in danger of being defrauded, and has no claims pending against it, it is in no need of protection and it would be incongruous to apply the Claims Act in a dispute between non-governmental claimants).

Because FABC strenuously presses its *Downie*-based argument in the face of overwhelming authority to the contrary, I am compelled to observe that the statute in question was amended by Public Law 97–258 on September 13, 1982. The language in *Downie* holding that non-compliance with the Assignment of Claims Act renders an assignment "absolutely null and void" was not a judicially created remedy crafted by the Supreme Court to deal with non-compliance with the Act, but rather a direct quote from and application of the statutory language as it existed in 1910. However, in 1982, the language rendering such assignments "absolutely null and void" was deleted from the Federal Assignment of Claims Act. FABC correctly cited the current statutory language on page 24 of its October 10th brief yet proceeded to argue as if *Downie* was an interpretation of the current statutory language and not the earlier statute which contained the phrase "absolutely null and void." The 1982 version of the Act provides the method for creating a valid assignment but does not contain language rendering other transfers or assignments null and void. There is no provision even remotely suggesting that a valid, perfected UCC security interest in accounts receivable granted by an entity entitled to receive payment from the government is void. The absence of such language renders *Downie* an anachronism.

FABC continues to urge, however, that the current statutory language should be so applied as to render non-complying assignments to be "absolutely null and void" notwithstanding numerous decisions retreating from the *Downie* rule and the subsequent deletion of that verbiage from the statute.

In support of its argument, FABC cites prefatory language to the legislative history accompanying the recodification of Title 31 which, in referring to Title 31 in its entirety, states in relevant part:

*Purpose:* The purpose of the bill is to restate in comprehensive form, without substantive change, certain general and permanent laws related to money and finance and to enact those laws as title 31, United States Code. In the restatement, simple language has been substituted for awkward and obsolete terms, and superceded, executed, and obsolete laws have been eliminated ...

*Revision of Language:* To restate the laws related to money and finance in one comprehensive title, it is necessary to make changes in language. Some of the changes are necessary to attain uniformity within the title. Others are necessary as the result of consolidating related provisions of law and to conform to common contemporary usage. In making changes in the language precautions have been taken against making substantive changes in the law ...

*Substantive Change Not Made:* As in other codifications undertaken to enact into positive law a title of the United States Code, this bill makes no substantive change in the law. It is sometimes feared that mere changes in terminology or style will result in changes in substance or impair the precedent value of earlier judicial decisions and other interpretations. This fear might have some weight if this were the usual bias of amendatory legislation where it can be inferred that a change in language is intended to change substance. In a codification law, however, the courts uphold the contrary presumption; the law is intended to remain substantively unchanged.

H.R.Rep. No. 651, 97th Cong. 2d Sess. 1, 2, 3–4, *reprinted in* 1982 U.S.Code Cong. & Admin. News 1895, 1896, 1897–98. FABC cites the foregoing legislative history for the proposition that "[t]he legislative history of the 1982 recodification can leave no doubt that Congress intended no changes in the substantive law and that it did not

intend to supersede judicial precedent decided under Section 203", the prior version of 31 U.S.C. Section 3727 (Dec. 17th Brief, p. 2).

FABC's legislative history argument fails, however, precisely because the substantive law following *Downie* had evolved so that the Act clearly applied only if the government had a "vital interest" to protect. *Mayo, supra.* In the absence of such an interest substantive law clearly upheld the rights of third parties to the assignment. Thus, when Congress deleted the "null and void" language it acquiesced to the view of the judiciary that such assignments are voidable by the United States but as between the parties they are enforceable under non-assignment Act laws (herein the UCC). It is astounding that FABC continues to insist that the legislative history somehow renders all post-*Downie* decisions inapplicable.

The government has been represented by counsel at numerous hearings on this matter and not once has asserted that any "vital interest" of the government is at risk. Since the Act is for the government's protection, it has been held that only the United States may assert it. *See United States v. Certain Space in Syracuse, New York,* 320 F.Supp. 491, 496 (N.D.N.Y.1969), *aff'd,* 435 F.2d 872 (2d Cir.1970), *cert. denied,* 402 U.S. 908, 91 S.Ct. 1381, 28 L.Ed.2d 649 (1971); *See also Mayo v. Pioneer Bank and Trust Co.,* 168 F.Supp. 503 at 518 (W.D.La.1958) (stating that the Act is "purely for the protection of the government"). I further note that no assertion has been made by any party that the government is subject to the multiplicity of claims or fraud that the Act was designed to prevent.

Finally, I note "[t]he plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters'." *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989). The Claims Act as revised in 1982 does not render every assignment of a claim against the United States "absolutely null and void." It merely provides a method for enforcement of such claims directly against the United States. In the absence of compliance with the Act, Ambassador has no direct right of action against the United States. But if it has fully complied with any alternative method of perfecting a security interest in proceeds of Debtor's contract with the United States, such interest is nevertheless enforceable. In the absence of language unambiguously voiding such a security agreement and in light of substantial authority to the contrary, I conclude that the holder of a UCC security interest in receivables has a security interest in funds when paid by the government to the same extent that it holds a perfected security interest in any other proceeds of accounts receivable.

It is axiomatic and requires no citation of authority that a perfected UCC security interest enforceable under state law is recognized in bankruptcy and to the extent that the debtor collects funds from the United States Government, it is beyond question or reasonable argument that Ambassador Factors' security interest attaches to those proceeds. The priority of that security interest will still be determined in accordance with the holding of this order relating to maritime lien claims, but for FABC to suggest initially and to have persisted in arguing that non-compliance with the Act rendered Ambassador's security interest void is absurd and accordingly, FABC's Motion for Summary Judgment on that point is denied.

The denial of FABC's Claims Act Motion also constitutes a determination that partial summary judgment is appropriate on Ambassador's claim that it has priority in freights over conflicting claims.

## ORDER

IT IS THEREFORE ORDERED that for the purpose of all future proceedings in this case:

1) Valid maritime liens, as hereafter allowed, will be entitled to a priority inter-

est in freights superior to the UCC created security interest of any creditor.

2) Non-compliance with the Assignment of Claims Act by any holder of an otherwise valid UCC security interest in freights will be deemed irrelevant and such interests will be afforded priority among themselves and in relation to unsecured claims as provided by the UCC.